**TEXAS DRYDOCK, INC., Appellant,**

v.

**Louis E. DAVIS, Appellee.**

**No. 09–97–326 CV.**

Court of Appeals of Texas,
Beaumont.

Submitted March 11, 1999.

Decided Nov. 23, 1999.

Elizabeth B. Pratt, John Cash Smith, Mehaffy & Weber, Beaumont, for appellant.

Mike Jacobellis, Tonahill, Hile, Jacobellis & Dutton, Beaumont, for appellee.

Before BURGESS, STOVER and HILL,* JJ.

## OPINION ON MOTION
## FOR REHEARING

BURGESS, Judge.

In reponse to the motion for rehearing filed by Texas Drydock, Inc., we withdraw

* The Honorable John Hill, sitting by assign-     ment pursuant to TEX. GOV'T CODE ANN.

our opinion of August 26, 1999, and substitute the following in its place.

Texas Drydock, Inc., appeals from a judgment in favor of Louis Davis, following a jury trial on Davis' personal injury claim. Davis suffered an injury while working for his employer, Crumpler Shipbuilders, Inc., on a cherry picker crane owned by Texas Drydock. Texas Drydock raises four issues on appeal.

At the time of the incident in question, Crumpler Shipbuilding, Davis' employer, maintained and repaired equipment for Texas Drydock. Davis was injured when he jumped from the cherry picker he was repairing. Texas Drydock's first three issues concern whether it exerted any control or right of control over the premises at the time Davis was injured.

■ Davis counters that this is not a premises liability case at all, but is instead a claim under RESTATEMENT (SECOND) OF TORTS § 323 (1965). This section provides that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

*Id.* The Texas Supreme Court has adopted this section of the Restatement. *See Colonial Savings Ass'n v. Taylor,* 544 S.W.2d 116, 119–20 (Tex.1976).

Davis testified that prior to the accident in question he had asked Bill Hardy, the safety coordinator for Texas Drydock, for

§ 74.003(b) (Vernon 1998).

some non-skid tape. He indicated Hardy told him to go ahead and get it. Davis stated when he told Hardy that he did not know where to buy it, Hardy said he would check into it to see if he could find, and get, Davis some. According to Davis, about two or three weeks later, he asked Hardy about the tape and was told it was hard to find and Hardy was still working on getting some. The last time Davis talked to Hardy about it, Hardy told Davis he was still checking into it.

In *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 396–97 (Tex. 1991), the Texas Supreme Court considered this issue. The court noted the American Law Institute (ALI) expressed no opinion as to whether the making of a promise, without entering upon performance, is a sufficient undertaking. *Id.* at 396. The court stated "[a] mere promise to render a service coupled with neither performance nor reliance imposes no tort obligation upon the promisor" and recognized that some courts "have imposed liability for breach of a promise alone in which there had been no performance but where the plaintiff's harm resulted from reliance on the promise." *Id.* The court then noted that in the case before it, there was "neither the slightest performance by the promisor nor reliance by the injured party." *Id.* The court found they "need not decide whether such reliance on the promise alone would give rise to liability. Without some affirmative course of action beyond the making of a mere promise or without reliance on that promise, the [defendant] cannot be held liable for [the plaintiff's] injuries." *Id.* at 397.

To summarize, the court in *Fort Bend* found that a promise without either performance or reliance was not an undertaking, and expressly declined to decide whether a promise *with* reliance was an undertaking. But section 323 provides that "[o]ne who

undertakes ... to render services to another ... is subject to liability ... if (a) his failure to exercise such care increases the risk of harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." Thus, section 323 provides that if either an increased risk of harm or reliance is present, only "an undertaking" is required to establish liability. The question, therefore, is whether "an undertaking" requires more than a promise, i.e., does it require "in any way entering upon performance." We find it does not.

■ We hold a promise can constitute an undertaking. This is not inconsistent with either the ALI's comment or *Fort Bend* because under section 323 there still must be, in addition to the promise, either an increased risk of harm or reliance. Accordingly, we find Hardy's representations comprise an undertaking that, when coupled with Davis' reliance, constitutes an affirmative course of action such that Davis had a basis for a claim under section 323 of the Restatement. Since Davis had a viable cause of action based upon a theory other than premises liability, Texas Drydock's contentions contained in issues one, two and three are overruled.

■ Texas Drydock argues in its final issue the evidence is both legally and factually insufficient to support the jury's failure to find Davis' negligence was a proximate cause of his injuries. In considering a legal sufficiency point, we consider only the evidence or inferences from the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). When attacking an adverse failure to find, on which it had the burden of proof, the appellant must show the evidence conclusively established all vital facts in support of the issue. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989); *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex.1982).

■ We consider all the evidence when reviewing a factual sufficiency challenge. If the challenge is to a failure to find, we reverse only if the failure to find is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Ames v. Ames*, 776 S.W.2d 154, 158 (Tex. 1989); *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex.1988).

The accident in question occurred when Davis was working on a cherry picker trying to determine the cause of the transmission failure. Davis gained access to the transmission by climbing from the cab to the fender of the cherry picker, where he descended into the area where the transmission parts were located. He was attempting to return to the cab when his foot slipped on the fender. Davis felt he was going to fall and rather than fall in an uncontrolled manner, he jumped to the ground, a distance of about six feet, injuring his back.

Davis admitted he had access to the steam cleaning equipment and tried to clean any equipment before working on it. Davis said he was supposed to steam clean the equipment when he could. Davis testified that Randy Crumpler told him, "Texas Drydock said not to clean it because they do not have time to clean it. They've got to have it in a hurry." Davis said when he picked up the cherry picker he was told to bring it back "[a]s soon as you get it fixed" because "[w]e [Texas Drydock] need it in a hurry." According to Davis, it would have taken an hour to steam clean just the area where he was working. It was Davis' testimony that he was instructed not to clean it. He said Randy told him not to because Texas Drydock told Randy not to clean it.

Randy testified that no one at Texas Drydock ever told him it was a rush job. He also said that even if it were a rush job, that would not have meant he could not

take time to steam clean it. According to Randy, he had never been told by Texas Drydock not to steam clean equipment. Randy testified it would take only twenty-five minutes to steam clean the area where Davis was working. Clarence Diehl, Davis' helper, estimated it would have taken twenty to thirty minutes, "if it's not extremely bad."

As noted above, Davis testified that prior to the accident in question he had asked Bill Hardy, the safety coordinator for Texas Drydock, for some non-skid tape. He indicated Hardy told him to go ahead and get it. Davis stated when he told Hardy that he did not know where to buy it, Hardy said he would check into it to see if he could find and get Davis some. According to Davis, about two or three weeks later he asked Hardy about the tape and Hardy said it was hard to find and that he was still working on getting some. The last time Davis talked to Hardy about it, Hardy told Davis that he was still checking into it. Davis admitted that he had not figured up how much tape he needed nor made any inquiries at any supply stores. Donald Campbell, a co-worker of Davis, testified Hardy acknowledged they were looking into getting the safety tape. Miguel Broussard, one of Texas Drydock's operators, confirmed that authority for non-skid tape would have to come from a "higher authority" than himself.

Randy Crumpler testified that Davis had the personal authority to buy non-skid tape and that it was within his personal spending authority at several local vendors. Hardy also testified that Davis was fully authorized to buy any nonskid tape he wanted. According to Davis, he was not authorized to purchase items costing more than $20 or $30 for repairs.

It was undisputed that there was no non-skid tape on the fenders and the part of the deck where Davis was working.

There was considerable testimony that the cherry picker was equipped with non-skid tape on appropriate areas, all of which had been applied before the accident, and that no additional nonskid tape was appropriate or needed. There was also evidence introduced that industry and OSHA[1] standards require the elevated surfaces of the cherry picker, such as the one Davis was on when he jumped, to have non-skid surfaces. These regulations and standards further require the cherry picker to be inspected daily and to be equipped with handrails and non-skid surfaces. There was evidence that when the cab faced rearward, there was no rail or grip for climbing on the deck of the cherry picker from the left side and the access from that side was inadequate. John Sexton, Texas Drydock's expert witness, admitted that to get on and off the cherry picker on that side one had to hold on to a tool box. He acknowledged that there were "[n]umerous times" when a worker would have to be on the fender of a cherry picker. Sexton said the fender, however, was not a work area and that to be on it would require some sort of a harness or ladder. Sexton agreed that if an operator was to work on an area in his normal activities, then it would be a work area, which should have either handrails or non-skid material.

Davis testified he did not like using the ladder to get into the cab because he had previously slipped on the ladder and hit his shins. The ladder had a steel grating surface designed to prevent slipping. According to Davis, the steel tread on the ladder did not hold. Davis said if there was oil on the ladder or his shoes, he would still slip. Davis thought the safest way to get from the compartment to the cab was to climb up on the fender and swing into the cab.

Randy Crumpler testified the safe way for Davis to enter the cab would have been

1. "Occupational Safety and Health Adminis-    tration."

using the ladder. John Sexton testified Davis' actions in moving from one level to another were unsafe and would violate safety standards and codes. According to Sexton, when going up an incline plane like that, handholds and stairs are needed. Sexton said the only way non-skid materials could be put on the fenders was if handrails and an access stairway were also present. Sexton opined that non-skid material should not be placed on the fenders because it would "imply that someone in the normal course of their work activities would go onto that type of a level with no protection." Sexton testified the proper way to access the area was to get out of the cab, go down the steps, walk around, and come up the other side. Crumpler and Diehl also testified this was the best way. Hardy testified Davis' manner of traversing the machine was unsafe. According to Hardy, the safest way would be to climb down the factory mounted footholds on the side of the machine.

Davis testified the cherry picker had three leaking hydraulic valves which could have been replaced at a cost of $3,000 each. Numerous attempts were made to correct the leaks but were unsuccessful. The one which leaked the worst was replaced, but the other two were not. Davis testified there was "no safe way" of climbing or walking on the equipment when it had oil on it. According to Davis, if the machine had been steam cleaned, it would have been safe for him to have climbed around on the fender and into the cab. Davis acknowledged there was nothing to hold onto and he knew there was oil on his boots when he climbed up on the fender.

Davis testified there was no one there that morning but Randy. Davis said Randy should have been helping him. Davis did not go look for Randy because he was instructed to get the machine fixed right away. According to Davis, it would have been a lot easier, and safer, if two people had been working on it.

■■ As reflected above, each side vigorously presented evidence in support of its respective position and the evidence was conflicting. "Controverted trial issues are properly within the province of a jury if reasonable minds could differ as to the truth of the controlling facts. *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex.1978). The jury's function as fact-finder was to weigh the credibility of the witnesses and to make a finding in regard to the issue of proximate cause." *Potter v. Anthony Crane Rental of Texas, Inc.*, 896 S.W.2d 845, 851 (Tex.App.—Beaumont 1995, writ denied). The jury was presented with sufficient evidence to find, and did so find, that the negligence of Texas Drydock proximately caused the injury to Davis. Based on the conflicting trial testimony regarding the propriety of Davis' conduct, it was within the sole province of the jury to reasonably conclude that Davis' actions were not a proximate cause of his injuries. Issue four is overruled. The judgment of the trial court is AFFIRMED.

JOHN HILL, Justice, dissenting, assigned.

I respectfully dissent, because the statements made to Davis by Bill Hardy, safety coordinator for Texas Drydock, as set forth in the majority opinion, do not constitute an undertaking of an affirmative course of action. *See Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 396–97 (Tex.1991). The words of § 323 of the Restatement require that there be such an undertaking. Under the terms of that section, there is liability only for one who undertakes to render services to another. In *Colonial Savings Ass'n v. Taylor*, 544 S.W.2d 116, 119 (Tex.1976), the Texas Supreme Court states the rule contained in § 323 as imposing liability upon one who voluntarily undertakes an affirmative course of action for the benefit of another. The Texas Supreme Court in *Fort Bend* held that words such as those used by Hardy "do not constitute an un-

dertaking of an affirmative course of action." *Fort Bend,* 818 S.W.2d at 396–97. The subsequent reference to "reliance" in § 323 relates to when someone who has engaged in such an undertaking may be liable, but it does not impose liability when there is reliance but no undertaking. *See also Houston Milling Co. v. Carlock,* 183 S.W.2d 1013, 1014 (Tex.Civ.App.—Eastland 1944, no writ), a pre-Restatement case.

It is true, as the majority notes, that the American Law Institute has expressed no opinion, with respect to § 323 of the Restatement, as to whether the making of a gratuitous promise, without in any way entering upon performance, is a sufficient undertaking to result in liability under that section. It is also true that the Texas Supreme Court in *Fort Bend* indicated that it did not decide whether reliance on such promises alone would give rise to liability. *Fort Bend,* 818 S.W.2d at 397. However, it is my view that what the court did decide in *Fort Bend* leads to the logical determination of the case before us because everyone agrees that the undertaking of an affirmative course of action is required, but the Supreme Court has said that mere promises such as those here do not constitute an affirmative course of action.

There is a division of authority in the United States over the issue of whether there may be liability under § 323 for the making of a promise alone, without the taking of any affirmative course of action, where the plaintiff has suffered injury as a result of reliance upon the promise. On the one hand, there is a large body of case law that has built up which holds that a mere gratuitous promise to render service or assistance, with nothing more, imposes no tort obligation upon the promisor, even though the plaintiff may rely upon the promise and suffer damage because of the reliance. *See* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, § 56,

at 379 (5th ed.1984). The authors acknowledge that there are other decisions possibly representing the beginning of the overthrow of that traditional rule. *See id.* at 380. It appears to me that the rule in Texas, for more than fifty years, as announced in *Houston Milling,* has been that there is no liability imposed on one who undertakes to do something that it is not contractually or otherwise obligated to do and then fails to keep that promise. My view is reinforced when the Texas Supreme Court announces in *Fort Bend* that mere promises such as Hardy made here do not constitute an undertaking of an affirmative course of action, especially where it has previously indicated, in *Colonial Savings,* that liability under this section of the Restatement is imposed on those who have undertaken an affirmative course of action. I therefore conclude that Texas up to now has followed the traditional rule.

It may reasonably be argued that the rule should be reexamined and that Texas should abandon the traditional rule in favor of the modern rule. It may be for that reason that the Supreme Court left the issue open in *Fort Bend.* However, I would hold that as an intermediate court we should follow the traditional rule, a rule that has been in place in Texas for so many years, and which may still be the majority rule, until the Texas Supreme Court determines that we are to abandon it in favor of another rule.

Inasmuch as Davis has no claim based upon § 323 of the Restatement, because the evidence shows that Texas Drydock did not enter into an affirmative course of action, and inasmuch as he failed to obtain a finding on an essential element of his claim based upon premises liability, his only viable cause of action, I would reverse this cause and render judgment that Davis take nothing.