NO. 07-08-0359-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

JULY 28, 2010
_____

THI OF TEXAS AT LUBBOCK I, LLC, D/B/A
SOUTHWEST REGIONAL SPECIALTY HOSPITAL,
APPELLANT

V.

MARIO PEREA, INDIVIDUALLY AND AS REPRESENTATIVE OF
THE ESTATE OF JACOB PEREA, DECEASED;
MAX PEREA; TONY PEREA; and GEORGE PEREA,
APPELLEES
_____

FROM THE 72TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2005-533.287; HONORABLE RUBEN REYES, JUDGE
_____

Before CAMPBELL, PIRTLE, JJ. and BOYD, S.J.[1]

**OPINION**

Appellant, THI of Texas at Lubbock I, LLC, (THI), d/b/a Southwest Regional

Specialty Hospital (Southwest Hospital) appeals from a judgment entered following a

jury trial in a medical malpractice action seeking wrongful death and survival damages

---

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (Vernon 2005).

in favor of Appellees, Max Perea, Mario Perea, Tony Perea, and George Perea (collectively Perea), and the estate of their deceased father, Jacob Perea (Jacob). In support, THI asserts: (1) the trial court erred by denying THI's proposed jury instruction on negligence; (2) the trial court erred by permitting Appellees to amend their petition during trial to assert an action for negligent credentialing/hiring; (3) the trial court erred by granting judgment on Appellees' negligence theories; (4) Appellees' evidence of gross negligence was legally and (5) factually insufficient; (6) the trial court erroneously excluded THI's testimony regarding an in-house investigation into the circumstances of Jacob's death; and (7) the trial court failed to apply certain statutory liability caps to the damage awarded in Appellees' favor.[2] We reverse the trial court's judgment and remand the case for further proceedings.

## Background

In December 2005, Appellees filed a medical malpractice action against THI, Pharmasource Healthcare, Inc. and Ominicare Inc., d/b/a Pharmasource Healthcare, Inc. (collectively Pharmasource), seeking wrongful death and survival damages.[3] Appellees' amended petition alleged that Southwest Hospital's nurses were negligent and grossly negligent in administering two fatal doses of Ativan to Jacob despite information known to Southwest Hospital's staff and located in his medical records

---

[2]The trial court applied the statutory damage cap in § 74.303 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.303 (Vernon 2005). THI asserts the trial court should have also applied the exemplary damage cap provided by § 41.008(b) and the noneconomic damage cap provided by § 74.301(b) of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 41.008(b) (Vernon Supp. 2009) & 74.301(b) (Vernon 2005).

[3]Michael Rice, M.D., was named as a defendant in Appellees' Original Petition but was not named in subsequent amended original petitions.

indicating he had an allergy to Ativan.[4]  Appellees asserted THI and Pharmasource acted with negligence, gross negligence, and malice.

## I.    Trial Amendment

During their case-in-chief, Appellees elicited testimony from Leonard Espinoza, a former charge nurse at Southwest Hospital who allegedly wrote an unauthorized order prescribing Ativan for Jacob, that he had, prior to being employed by THI at Southwest Hospital, similarly administered Ativan to a patient without a physician's authorization and was disciplined by the Colorado Board of Nurse Examiners.  Afterwards, Appellees sought to amend their original petition to allege THI was negligent for credentialing or hiring Espinoza because "it knew or should have known [Espinoza] was incapable of providing safe and competent care to" Jacob.  The trial court permitted the amendment.

## II.    Evidence at Trial -- Medical Malpractice Claim

In 2004, Jacob was a seventy-eight year old widower with four sons—Tony, George, Max, and Mario.  He had a history of heart disease complicated by respiratory issues and diabetes.  Nevertheless, until he experienced a fall in November 2004, Jacob spent his time maintaining seventeen acres of land owned by his sons.  During the summer, he arose at 5:00 a.m. to mow and shred the land, quit at 10:00 a.m. due to the heat and then resumed at 6:00 p.m.  He cleaned his own home and did not regularly use a walker or cane.  He performed these tasks despite intervening gall bladder and heart surgeries.

---

[4]Appellees' expert, Joe Haines, M.D., testified Ativan is a tranquilizer in the benzodiazepine class prescribed as a sedative to help people sleep, for anti-anxiety, and persons with panic attacks.  Ativan is a controlled substance.

In April 2004, Jacob was admitted to Covenant Medical Center in Lubbock, Texas, to have his gallbladder removed. While at Covenant, Jacob experienced confusion and was sedated with morphine and Ativan. Two days later, his cardiologist noted Jacob's "confusion [was] worse" and that "he may be over-sedated." Later, the same day, his cardiologist noted Jacob "was still confused, too sedated," and suspended the use of Ativan. The following day Jacob's neurologist noted Jacob was sitting in a chair, quite alert and attentive but still confused. His neurologist also noted that "holding . . . other potentially sedating meds is also working." Two days after the medication change, Jacob was discharged.[5] Several days after returning home, Mario observed that his father's "mind was straight."

In May, Jacob was again seen at Covenant complaining of abdominal pain. On admission, his physical exam showed he was awake, alert, and able to answer questions reasonably well. His final diagnosis prior to discharge was acute renal failure. The discharge also stated Jacob was "not in clinic for congestive heart failure, medications adjusted, no episode of chest pain or shortness of breath, had baseline chronic renal insufficiency."

In June, Jacob returned to Covenant complaining of confusion and chest pain. During a consultation, his doctor noted Jacob had received Ativan the night before for agitation and appeared alert. His doctor opined that Jacob "likely has baseline dementia [with] secondary decompensation due to medical problems, change in environment, etc." His doctor subsequently issued an order to avoid Ativan. Jacob was

---

[5]Jacob's final diagnosis on discharge was confusion/dementia, respiratory failure, severe coronary artery disease with old myocardial infarction, history of congestive heart failure, chronic renal failure/acute renal failure, mitral insufficiency of 2+, diabetes, and pneumonia.

later discharged home with continuation of home medications. His discharge summary indicated "[n]o acute interaction planned … cardiac status-wise."

In July, Jacob underwent a successful coronary bypass surgery. Within weeks after the surgery, Jacob was driving and attending to his normal schedule. His doctors told Mario that morphine, prescribed for Jacob in the hospital, was causing him to be disoriented at home and Ativan was a major problem for Jacob. His discharge summary indicated there were no "operative complications, able to discharge home—stable condition."

In September, Jacob was admitted to Covenant suffering from shortness of breath. His doctor recommended Jacob continue his current heart medications while considering dialysis for chronic renal failure. Jacob was discharged three days later. His discharge summary stated "nothing acute, medications, home with family." In October, Jacob was admitted with complaints of shortness of breath. He was treated and "discharged in good condition."

In early November, Jacob was admitted to Covenant complaining of abdominal pain. He had missed his regularly scheduled dialysis and was feeling poorly with fluid overload. After a consultation, his doctor diagnosed Jacob as suffering from "congestive heart failure secondary to fluid overload." He recommended Jacob be discharged after dialysis and continue his current heart medications.

In late November, Jacob returned to Covenant complaining of a fall. His vital signs were stable. A CT scan showed a slight cervical spine fracture and he was placed in a collar. On examination, his doctor noted he was a "well-developed and well-nourished male who [was] sedated but arousable and follow[ed] commands." His

doctor recommended Jacob undergo an MRI but recommended the test be delayed until the next day because Jacob was "too sedated [and] his myonclonus is too jerky for his MRI; at this time." His overall treatment plan was to admit Jacob, perform dialysis, resume his medication, and closely monitor.

During a discussion on December 1, Jacob's family informed Covenant's medical staff that Jacob became confused on Ativan. The staff then listed Ativan as an allergy for Jacob and notified the pharmacy. On December 2, Dr. C.J. Wheeler wrote an order indicating Jacob was sensitive to "Ativan/Benzodiazepines." For the MRI, he ordered that Jacob be sedated with Demerol and Versed[6] with an antidote available in case of over sedation.

Prior to the MRI, Jacob was given Versed to sedate him while the MRI was being performed. Four hours later, Jacob went into cardiac arrest. He was intubated and placed on a breathing machine or ventilator. Naidu Chekuru, MD, performed a consultation and noted that "[a]n MRI was planned; as [Jacob] was too restless I believe they gave him Ativan which led to cardiopulmonary arrest" and "[h]e was required to be intubated and ventilator support." A Covenant charge nurse's report showed Jacob was allergic to morphine and Ativan. The allergies were also listed in his Restraint Assessment, Physician Order and Documentation Protocol: "Allergies: Morphine/Ativan."

On December 12, Jacob was discharged from Covenant and transferred to Southwest Hospital, a skilled nursing facility, under the care of Kenneth Michael Rice,

---

[6]Versed is in the same drug family as Ativan, i.e., benzodiazepine, and is faster acting than Ativan.

M.D. The narrative summary indicated Jacob, on admission, was "neurologically intact, stable cardiac evaluation." Recommendations included a neck brace to immobilize Jacob's neck and continuation of antibiotics. The discharge summary noted that Jacob was "released in stable condition" and he was "ALLERGIC TO LORAZEPAM[7] AND MORPHINE."

On December 15, Nurse Jahomo admitted Jacob to Southwest Hospital at approximately 4:40-4:45 p.m. Jacob's original chart from Covenant indicated he had allergies to morphine and Ativan. In addition, Covenant's patient transfer form listed Ativan in the area related to drug sensitivity. Nurse Jahomo filled out a nursing assessment form indicating Jacob was allergic to Ativan, placed an allergy sticker on his chart and an allergy bracelet on his wrist.[8] On Dr. Rice's admitting orders, Nurse Jahomo wrote that Jacob had allergies to morphine and Ativan.[9] She testified that, from

---

[7]Nurse Angie Jahomo, a charge nurse at Southwest Hospital, testified at trial that Lorazepam is the generic name for Ativan and, as such, is recognizable by all medical professionals.

[8]Nurse Jahomo testified at trial that the bracelet is the last thing a nurse looks at before giving medication to a patient. She also testified that "[a] nurse would not think an allergy bracelet was a piece of jewelry, general practice is to look at the bracelet before giving the medication." If a nurse gave a patient medication without looking at the allergy bracelet, Nurse Jahomo testified the nurse would be negligent. She testified it would be extremely dangerous for a nurse to give medication to a patient without a doctor's prior approval and the nurse would lose his/her license. If she observed such an incident, she would report the errant nurse. Further, if a bracelet or chart sticker came off, she testified a nurse would be negligent for not replacing it.

[9]Nurse Jahomo testified she gave a copy of Dr. Rice's orders to the pharmacy and notified them of Jacob's allergies. She expected the pharmacy to enter the information in the computerized medicine dispensing system. If a patient is allergic to a particular medication and a nurse attempts to dispense that medication through the computerized system, the nurse will get a flashing screen indicating the patient has an allergy to the medication. Although Jacob's allergies were listed on Covenant's Medical Administration Record (MAR), his allergies were not listed on Southwest Hospital's MAR. Rather, at the top of Southwest Hospital's MAR, it stated: "Allergies: NKA (no known allergies)." At trial, Nancy Dipprey, the pharmacist on duty when Jacob was admitted, testified she believed the allergies were not written on Nurse Jahomo's admitting orders received by the pharmacy. She also testified she received a copy of the admitting orders and, because they were not official records, the records had been destroyed. Nurse Jahomo testified she received an incorrect MAR from the pharmacy that day but failed to notice the error. She accepted responsibility for not correcting the pharmacy.

7

the information she initially put in the medical records, every nurse who later cared for Jacob on every shift should have known he was allergic to morphine and Ativan.

That evening, Dr. Rice received a call from Mario who was requesting to take his father home. Dr. Rice spoke to Mario and explained that his father had suffered a serious fracture and might be paralyzed if not properly taken care of. Mario relented but informed Dr. Rice that his father had allergies or side effects to morphine and Ativan. Dr. Rice assured Mario that Southwest Hospital had procedures to "guard against such a thing happening."[10]

On December 16, Dr. Rice noted in Jacob's "History and Physical: Allergies: Morphine and Ativan."[11] In an early morning Nursing Documentation Report ("NDR"),[12] the nurse acknowledged: "Allergies; MSO4 [morphine], Ativan." This acknowledgement was carried over to the NDR for the next shift beginning at 7:00 p.m. which also listed

---

[10]After speaking with Mario, Dr. Rice wrote in Jacob's chart that Mario had reported Jacob "had a paradoxical reaction to Ativan, becomes agitated but does not have a true allergy." Dr. Rice testified that a side effect was different than an allergy. Nevertheless, Dr. Rice testified he did not want Jacob to receive Ativan. He testified that, when the issue came up, he informed the nurse that Jacob should have no medication from the benezodiazepine class. Dr. Rice also testified it is well described in literature that Ativan in geriatric patients or a severely ill patient does not calm them down like it is supposed to but actually causes them to become wilder and more agitated. Because of what Jacob's son said, the possibility of a C2 fracture, Jacob had a bad heart and underlying disorders, Dr. Rice did not want any stimulus that might cause him to have a heart attack or complicate his condition. Accordingly, Dr. Rice prescribed Zyprexia, a sedative or antipsychotic drug of a different drug class than benezodiazepine that is used to calm persons who have sensitivity to Ativan.

[11]Dr. Joe Haines, plaintiff's expert, testified that, once Dr. Rice had noted Jacob was allergic to morphine and Ativan, a second order by Dr. Rice or another doctor would be necessary to countermand Dr. Rice's initial order to permit Jacob to receive Ativan.

[12]An NDR is patient specific and routinely filled out by the nurse caring for the patient during a particular shift. The first entry on the NDR is typically an acknowledgment by the nurse shift that he or she received and reviewed the NDR written by the nurse on the prior shift.

8

morphine and Ativan as allergies for Jacob. The NDR and Dr. Rice's progress note dated December 17 both indicated Zyprexia was effective for treating Jacob.

A physical examination showed "cardiovascular, regular rate and rhythm, chest— bilateral breath sounds are diminished throughout." The NDR for the shift ending at 7:00 a.m. on December 17 indicated the nurse had received the prior report and assumed care. Jacob received Zyprexia which he tolerated well and was resting. The Report also listed morphine, Ativan, and Demerol as allergies for Jacob. A second NDR for the 7:00 p.m. shift also listed Jacob's allergies as Ativan and Demerol.

On December 18, Kimberly Graham, Dr. Rice's Nurse Practitioner,[13] examined Jacob. She observed Jacob was a little sedated, but calm. She checked his breathing status, vital signs, noted his oxygen saturations, respiratory rate, and "didn't see anything abnormal."[14] She testified she had no discussions with Espinoza, the charge nurse then responsible for Jacob's care, while she was at the hospital. She also testified that she did not write an order permitting Espinoza to administer Ativan to Jacob. She testified that, if she had changed the prescription to Ativan, she would have had a prior discussion with Dr. Rice, and, if approved, written or phoned in an order prescribing a much lower dose than 2 mg. and discontinued Zyprexia--none of which occurred.

---

[13]A Nurse Practitioner's license permits the nurse to write prescriptions.

[14]Jacob's Progress Note for December 18 indicated he was on Zyprexia for agitation and was negative for shortness of breath, negative chest, negative nausea, or vomiting. The Note's Assessment and Plan stated the following: "1. Status post C-spine fracture, continue Minerva brace and follow-up with Dr. Willis; 2. Fall, diligent fall precautions; 3. End stage renal disease – continue prn dosing as well and monitor; 5. Atrial fibrilliation – patient on Coumadin as well as Lorenex, continue these and recheck on 12/20/04."

Nurse Frances Rosales was assigned to Jacob from 7:00 a.m. to 7:00 p.m. on December 18. She testified that to familiarize herself with Jacob, she reviewed his MAR and physician's orders for her shift--neither of which alerted her to Jacob's allergies.[15] She also could not recall whether Jacob was wearing an allergy bracelet. At 1:00 p.m., she testified Jacob became upset, tried to get out of bed, and was agitated. At 2:00 p.m., she medicated him with Zyprexia to calm him. At 6:00 p.m., she testified Jacob was attempting to climb out of bed and she notified her supervisor, charge nurse Espinoza. She testified Espinoza told her to administer Ativan to Jacob. She gave Jacob two milligrams. For the remainder of her shift, she testified Jacob rested with his eyes closed.

Espinoza testified that, as charge nurse, he managed the staff of floor nurses and any communications to a physician came through him. Espinoza testified he "believe[d]" he contacted Kimberly Graham by telephone and she gave him the order for Ativan.[16] Although, on examination, he first denied ever giving Ativan to a patient without a doctor's authorization, he later conceded on cross-examination that he administered Ativan without a doctor's order when he was a nurse in Colorado and was disciplined for that conduct. He agreed it was extremely dangerous to give Ativan without a doctor's order and, after the Colorado incident, he realized he had put the patient in Colorado in extreme risk. He testified further that "[i]n December 18, 2004, he

---

[15]The NDR from the prior shift ending at 7:00 a.m. indicated Jacob had allergies to Ativan and morphine. Although Nurse Rosales's NDR indicates she received the prior NDR showing Jacob had allergies to Ativan and morphine, her subsequent NDR given to Nurse Joiner at the 7:00 p.m. shift indicates "NKA" or no known allergies.

[16]Dr. Rice and Graham both denied giving any order to Espinoza approving administration of Ativan to Jacob.

10

knew what extreme risk of harm he could put [Jacob] in by giving him Ativan without a doctor's orders." He also agreed that, "if he wrote the order, he would be consciously disregarding [Jacob's] health, safety and welfare."

Nurse Rosales reported Jacob's condition to Nurse Rick Joiner who was assigned to care for Jacob for the 7:00 p.m. to 7:00 a.m. shift. Nurse Joiner looked at Nurse Rosales's NDR, Jacob's MAR, and his CARDEX[17] – neither of which he testified indicated Jacob had an allergy to Ativan.[18] He noticed that, on Nurse Rosales's NDR, Jacob had received a two milligram dose of Ativan earlier. At 1:30 a.m., when Jacob was again acting agitated, Nurse Joiner administered a second two milligram dose of Ativan to Jacob. Before administering the drug, he noticed a pink band on Jacob's wrist but, because it was not one of theirs, he did not attend to it.[19] Nurse Joiner checked on Jacob at 3:30 a.m. and noted Jacob's "respiration [was] even, unlabored." At 5:40 a.m., he noted that Jacob was "sleeping quietly in bed." Nurse Joiner did not check Jacob's vital signs and testified each of these visits lasted a maximum of thirty-five seconds. When his shift ended at 7:00 a.m. on December 19, Nurse Joiner left the hospital.

Fifteen minutes later, at 7:15 a.m., Joiner's replacement discovered Jacob had no vital signs and was unresponsive. CPR was started at 7:18 a.m., Jacob was intubated at 7:27 a.m., EMS obtained a good pulse and Jacob was transported to

---

[17]A CARDEX is a short form listing the relevant medical information for a patient including an update from the prior nurse. Nurse Rosales testified Jacob's CARDEX should have included a summary of his allergies, condition, procedures, etc. Nurse Rosales could not remember Jacob's CARDEX and it was not entered into evidence.

[18]Nurses Rosales's and Joiner's NDR both indicated Jacob had no known allergies.

[19]Nurse Joiner testified Southwest Hospital's bands were red and white. He also testified he did not attend to the band because he thought it was a piece of jewelry or religious artifact.

Covenant where he was admitted for respiratory failure. Southwest Hospital's discharge summary did not list Ativan as a medication received by Jacob.[20]

After arriving at Covenant, Jacob was again intubated and placed on ventilation support. Dr. Wheeler examined Jacob and noted he was "currently obtunded, probably secondary to Ativan injection."[21] Dr. Wheeler noted that "allergies noted on [Southwest Hospital's] history show morphine and Ativan." Under medications, Dr. Wheeler stated: "[Jacob] was recently given Ativan 2 mg IV push q. 4 hours p.r.n., he has received two doses of this over the last 24 hour period." Dr. Wheeler's problem list was, in pertinent part, as follows: "1. decreased mental status, previous agitation; 2. respiratory failure now on ventilator and intubated . . . 7. congestive heart failure with elevated BNP. He noted Jacob's "heart had a regular rate and rhythm," and, under allergies, he wrote: "MSO4 AND ATIVAN."

The admission report of consulting physician Srinivas Kadiyala noted Jacob was found at Southwest Hospital "unresponsive and in cardiorespiratory arrest." She also stated:

> As per the nursing staff on the floor, the patient apparently had a respiratory arrest when he was in this hospital a few weeks ago. It was felt he was sensitive to Ativan at the time of the CT scan study.

---

[20]Mario testified he observed the allergy band he first observed at Covenant, and later at Southwest Hospital, on his father's wrist when he arrived at Covenant's emergency room where a nurse cut the band off for him. The band was admitted at trial and indicated Jacob had allergies to morphine and Ativan. Dr. Rice testified he discovered Jacob had received Ativan and was angry because his written order had been ignored. He subsequently took the matter up with Southwest Hospital Administrator, Deanna Graves, and she agreed to do something about their systems.

[21]Dr. Hail, THI's expert, defined "obtunded" as "a word that can mean confused or unconscious. It can be a spectrum, altered mental status . . . in this case, with it being after [Jacob] coded at Southwest [Hospital], [Dr. Wheeler] is referring to the brain death or getting close to that." Dr. Hail further testified that, by the phrase "secondary to Ativan injection," Dr. Wheeler "is hypothesizing that the cause of [Jacob's] obtundation is from the Ativan. . . ."

There was little, or no, change in Jacob's condition during the following week and, after a long discussion, Jacob's family decided to place him as do-not-resuscitate. Jacob expired shortly after he was removed from the ventilator.

### III.     Expert Testimony

Expert testimony at trial centered around whether Jacob's death was caused by the administration of the two doses of Ativan by Southwest Hospital's nurses on December 18 and 19.

### A.     Appellees' Expert – Joe Haines, M.D.

Joe Haines, M.D., testified that, in his opinion, Southwest Hospital's nurses were negligent in Jacob's care and treatment. He testified Southwest Hospital's nurses administered the Ativan despite extensive documentation of his allergy.

He also testified their negligence caused Jacob's death. Based on his experience, he testified common side effects from Ativan range from sedation and respiratory depression (not taking enough breaths or not breathing deeply enough) to agitation and confusion.[22] He also testified Ativan's manufacturer listed respiratory depression as the top adverse reaction to the drug and an overdose of Ativan can cause respiratory depression to the extent the person's heart stops. Based upon Jacob's past medical history that indicated Jacob had experienced serious problems with Ativan, in particular his cardiac arrest subsequent to being sedated for an MRI at Covenant, he opined the dosage was too high for Jacob considering his age, his sensitivity to the drug, the drug's side effects, and Jacob's multiple health problems.

---

[22]Dr. Haines explained that a drug such as Ativan, which normally sedates a patient, might also cause agitation and confusion in some people, represents what is termed a "paradoxical reaction, i.e., "where you get the opposite of what you are trying to achieve."

13

Dr. Haines opined that, after Jacob received the second two milligram dose of Ativan at 1:30 a.m. on the morning of December 19, he was overdosed and over-sedated causing his breathing to become increasingly more shallow until there was insufficient oxygen to support the functions of the heart or brain causing his heart to go into arrhythmia until Jacob suffered a cardiac arrest and finally quit breathing altogether due to respiratory depression. Dr. Haines testified that prior to the multiple doses of Ativan, the medical records did not show Jacob was experiencing irregular heart rhythms that were dangerous or any symptoms indicating a heart attack, i.e., chest pains, nausea, shortness of breath.

He also testified that, although Jacob did not undergo a medical test to determine whether he had an actual "allergy" to Ativan, there was sufficient evidence in his medical records to show he reacted badly to the drug, i.e., Jacob quit breathing four hours after receiving Versed (a faster acting drug of the same class as Ativan--Benzodiazepine) prior to the MRI at Covenant. Dr. Haines testified that the documentary evidence showed his physicians had seen enough evidence and been sufficiently warned by Jacob's family to show "the doctor's [were] obviously concerned, and they are concerned enough to enter it on the chart, so that everybody that looks at the chart that day will see that. . . . So it's basically putting everybody on alert. Don't use this drug on this patient." Although he recognized that Jacob's reaction to Ativan might be characterized in his medical records as an "allergy," "sensitivity," "adverse reaction" or "paradoxical reaction," he testified "[w]hat is important is that they didn't want him to have [Ativan], because it was bad for him to have [Ativan], and they should have known that and not given it to him."

14

Dr. Haines opined that the administration of the two doses of Ativan to Jacob by Southwest Hospital's nurses involved an extreme degree of risk considering the probability and magnitude of potential harm to Jacob. Further, Dr. Haines opined that Espinoza had actual awareness of the risk involved but proceeded with conscious indifference to the rights, safety, and welfare of Jacob. In sum, Dr. Haines opined that Southwest Hospital and its nurses were grossly negligent.

### B. THI's Experts – Stacey Hail, M.D. and Kenneth Rice, M.D.

Stacey Hail, M.D., opined that the two doses of Ativan did not proximately cause Jacob's death. Rather, she testified he died of a heart attack. She testified Jacob's medical records indicated he had a long history of coronary artery disease that resulted in scar tissue on his heart from past heart attacks. The scar tissue was irritable and had a tendency to cause arrhythmias, i.e*.,* an accelerated heart rate. In her opinion, an arrhythmia caused Jacob's heart attack and he died from a fatal ventricular tachyarrhythmia.

In support, she relied on approximately fifteen pages of telemetry strips obtained from heart monitors attached to Jacob on December 1, 3, 5, 6, 10, 14, and 15 while he was at Covenant.[23] She also relied on the results of a blood test taken on December 19 at 8:00 a.m., an hour after Jacob had been found unresponsive at Southwest Hospital and been admitted to Covenant. The blood test showed positive troponins

---

[23]Dr. Hail testified "[t]elemetry is just essentially an EKG over a period of time." On cross-examination, however, Dr. Hail conceded that a hospital usually pulls only those strips that are abnormal and agreed with counsel that she had left many strips behind because an entire day's reading would comprise thousands of such strips. She also conceded that doctors at Covenant had also looked at the strips and no one diagnosed Jacob as having a heart attack. Jacob was not connected to any monitoring devices while at Southwest Hospital.

measuring .26 indicating to her that Jacob had suffered a heart attack.[24] Later, at midnight (sixteen hours after Jacob had coded at Southwest Hospital), Jacob's troponin level measured 1.23. In addition, she testified his Basic Metabolism Panel (BMP) was greater than 5,000 indicating the "possibility" of congestive heart failure.[25]

She further testified Ativan did not cause Jacob's death because he did not have an allergy to the drug and Ativan does not affect the cardiac muscle. She testified Ativan works on the same brain receptor that alcohol does and the drug makes you sleep---the higher the dose the longer you sleep.

She testified Ativan does not cause respiratory depression based upon her experience with suicidal patients she had seen in the emergency room. She opined that "two milligrams of Ativan is, by no means, an overdose," based on her experience in the emergency room where she has prescribed "a dose of eight milligrams at one time."[26]

Dr. Rice opined that Jacob died from his underlying medical conditions. After his first visit with Jacob, he noted his multiple medical problems[27] and concluded Jacob was "at a very high risk for respiratory failure, SCD [sudden cardiac death], and fluid overload." In support, he also relied on Jacob's troponin levels and an elevated BMP of 5,000, both measured after Jacob was transferred from Southwest Hospital to

---

[24]Dr. Hail testified a troponin blood test is specific to having a heart attack.

[25]"'Perhaps' and 'possibly' indicate conjecture, speculation, or mere possibility rather than qualified opinions based on reasonable medical probability." *Columbia Medical Center of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 247 (Tex. 2008).

[26]On cross-examination, Dr. Haines testified that the patient who received the eight milligram dose of Ativan was a sixteen year old who was suffering from a bad LSD trip.

[27]End stage renal disease, congestive heart failure, stroke, and diabetes.

16

Covenant.[28] In his opinion, Covenant's laboratory results "proved conclusively that [Jacob] suffered an acute myocardial infarction and, most likely, based on his history and underlying medical problems, was the cause of his death."

Dr. Rice testified Jacob's death was not consistent with an overdose of Ativan because: (1) there is no scientific evidence that Ativan causes respiratory depression or distress; (2) heart attacks or sudden cardiac death usually occur within a very short period of time; and (3) he would have expected to see an adverse reaction from the Ativan within several minutes or hours.

On cross-examination, however, Dr. Rice agreed that respiratory failure is a side effect of Ativan reported by its manufacturer and decreased oxygen from decreased respirations can cause brain injury. Although he testified there was no scientific proof Ativan causes respiratory depression or failure, he conceded the side effect was listed by the manufacturer as a possible side effect. He also agreed that complications from taking a drug of the benzodiazepine class include obtundation—a level of consciousness before a coma.

He testified that he did not want Jacob to take Ativan because: (1) it is well known in literature that Ativan, in geriatric patients or in a severely ill patient, can cause a paradoxical result; (2) becoming more agitated was the type of reaction to Ativan described by Jacob's son; (3) he did not want Jacob to become significantly agitated because he had a bad heart, underlying disorders, and a C2 fracture; and (4) he did not

---

[28]Dr. Rice testified an elevated BMP is a "marker for high probability or risk of death. It is also a marker for congestive heart failure or ventricular strain." He further testified that, in patients with underlying cardiac disease coupled with end stage renal disease or diabetes, BMP levels of the magnitude of Jacob's are a very high indicator for likely death, "a marker for mortality."

want Jacob to raise his heart rate, nor put him on any type of stimulus that might cause him to have a heart attack or complicate his actions.

## IV. Evidence at Trial -- Negligent Credentialing/Hiring

In Appellees' case-in-chief, Dr. Haines was asked whether a director of nurses or administrator of a facility should have some involvement in ensuring the employment of competent nurses. Dr. Haines responded that a person in that position should research the references of people that they hire, i.e., they should determine the nature and extent of their training and their past employment record. They should also learn whether there were problems at previous hospitals, and they should investigate any previous firings or allegations of inappropriate conduct.

Espinoza testified that, in September 1997, he agreed to a stipulated order from the State Board of Nursing in Colorado placing him on probation for administering Ativan to a patient without a physician's order and failing to document the drug's administration while working at a care center in Colorado Springs, Colorado. The conditions of his year-long probation were: (1) service while employed as a nurse for at least an average of thirty-two hours a week under adequate supervision by a licensed nurse with an unrestricted license; (2) board notification of the commencement or termination of such nursing employment; (3) submission of a written plan of nursing supervision for the Board's review and approval within six months of obtaining nursing employment; (4) completion of Board-approved education courses (twelve to fifteen hours of legal/ethical course(s); one credit pharmacology course); (5) provision of a copy of the stipulated order to the immediate nursing supervisor at his place of employment; (6) submission of a written report to the Board acknowledging, among

18

other things, that the stipulated order was read and that the role of nursing supervisor was understood by that supervisor; and (7) in the event of relocation to another state, Espinoza would notify the Board of his change of address and give consent to the Board that it may notify the Board of Nursing of the state to which Espinoza relocated of the existence of the terms of and Espinoza's compliance with the stipulated order.

Espinoza testified that, after the complaint in Colorado was filed, he relocated to Texas and immediately started to practice as a nurse without disclosing the complaint or the Colorado Board proceedings. When the stipulated order was entered, he did not disclose that fact to his employer, Methodist Hospital in Lubbock, Texas, and he did not comply with any of the obligations required by that order.

From June 1996 to April 1997, Espinoza worked at Methodist Hospital. From May 1997 to September 2001, he worked at Highland Medical Center under the supervision of Connie Long. During the hiring process, although he did disclose his previous employment in Colorado, the Colorado Board disciplinary proceedings never came up. Sometime in 1997, more than six years prior to the incident giving rise to this litigation, Espinoza did speak to Long about his probation in Colorado.

Espinoza testified that in 2002 Long recruited him to work at Southwest Hospital. He testified that, at the time, even though she was aware of his stipulated order with the Colorado Board of Nursing, she did not have a problem putting him on the floor and permitting him to dispense medications to patients.

19

Espinoza further testified that in early 2005 he informed Long that he had a drug addiction. [29] Notwithstanding this admission, Long continued to permit him to work at Southwest Hospital. On December 22, 2005, just over a year after Jacob's death, Espinoza was discharged by Long and Southwest Hospital Administrator Deanna Graves. In May 2007, Espinoza surrendered his license to the Texas Board of Nurse Examiners pursuant to an agreed order. The agreed order indicated that from approximately July 28, 2005, through August 8, 2005, Espinoza misappropriated morphine and Demerol from Southwest Hospital's computerized medicine dispensing system and took the medicine himself without proper authorization. The order further indicated that he had used the drugs for his own use and not the patients, and that at times he was impaired on duty--sleepy, sleep-walking, running into walls, falling asleep at patients' bedsides. In addition, it was determined that he had inserted an external jugular venous catheter into a patient without authorization.

During trial, Dr. Rice was asked whether a nurse whose license was suspended in 1997 for giving a medication to a patient without having obtained a doctor's order was unfit for employment as a nurse in 2004, and he responded "no." He further testified that it was okay to hire such a nurse if he or she had done everything they were supposed to do as required by the board of nurse examiners to rectify the mistake. He opined that nurses that go through rehabilitation deserve a second chance because they have complied with the board's orders related to probation or suspension. If not, he testified, they would not have a license and could not work. He further testified that a

---

[29]Espinoza's testimony subsequently equivocated on the timing of this disclosure to Long. After testifying Long was aware of his drug addiction in early 2005, he later testified she was not aware until September 2005.

nurse "out there writing orders without permission puts a patient in an extreme risk, if put in extreme risk, could suffer injury to the patient's life."

## V.      Jury Instructions

Following the presentation of all the evidence, the trial court issued its jury charge stating, in pertinent part, as follows:

QUESTION 1

Did the negligence, if any, of those named below proximately cause the injury in question?

Answer "Yes" or "No" for each of the following:

Southwest Regional Specialty Hospital              _____

Pharmasource Healthcare                                    _____

STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES--GENERAL NEGLIGENCE; INTENTIONAL PERSONAL TORTS, PJC 4.1 (2008).[30]

---

[30]As to Southwest Hospital, "negligence" and "proximate cause" were defined as follows:

"Negligence" when used with respect to the conduct of Southwest Regional Specialty Hospital means failure to use ordinary care, that is, failing to do that which a hospital of ordinary prudence would have done under the same or similar circumstances or doing that which a hospital of ordinary prudence would not have done under the same or similar circumstances.

"Proximate Cause" when used with respect to the conduct of Southwest Regional Specialty Hospital means that cause which, in natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a hospital using ordinary care would have foreseen the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES--GENERAL NEGLIGENCE; INTENTIONAL PERSONAL TORTS, PJC 2.4 (2008).

QUESTION 3

What sum of money would have fairly compensated Jacob Perea for --

a. Pain and mental anguish . . . means the conscious physical pain and
   emotional pain . . . experienced by Jacob Perea before his death as a
   result of the occurrence in question. . . .

STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES--SURVIVAL DAMAGES,
PJC 10.2 (2008).

QUESTIONS 4-7

What sum of money, if paid now in cash, would fairly and reasonably
compensate [Mario, Max, Tony, George] for [their] damages, if any,
resulting from the death of Jacob Perea?

STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES--WRONGFUL DEATH
DAMAGES, PJC 9.3 (2008).

THI sought to replace Question 1 with the following language: "[d]id the

negligence, if any, of the ones named below proximately *cause the death* of Jacob

Perea?" (Emphasis added). Appellant also made the following objection, in pertinent

part to the charge:

> [T]he question should be a question about whether the negligence of
> either of the two Defendant parties proximately caused the death of Mr.
> Perea. . . . And I say this because only in the event that the negligence of
> the Defendants caused the death of Mr. Perea are wrongful death
> beneficiaries entitled to recover. If the jury were to believe that some act
> or omission by the employees of Southwest . . . . or Pharmasource . . .
> caused an injury to Mr. Perea, but not his death, then the wrongful death
> beneficiaries would not be entitled to recover. . . . *The only evidence of*
> *injury in this case is death.* So the Court's Charge should reflect that, and
> the jury's answer should also reflect that they are actually answering the
> question that would permit recovery of wrongful death beneficiaries.

[Emphasis added].

## VI.    Judgment

Thereafter, the jury found THI and Pharmasource proximately caused the injury in question[31] and awarded Jacob's estate $159,718.40 in damages for pain and mental anguish, medical expenses, and funeral and burial expenses.[32]  Jacob's sons were each awarded $100,000 for past loss of companionship and society, future loss of companionship and society, past mental anguish and future mental anguish for a total of $400,000.  The jury also found that Southwest was grossly negligent and awarded exemplary damages of $1,250,000.  Based upon these jury findings, the trial court entered a judgment decreeing that Appellees recover from THI the sum of $1,696,895.50.[33]

In its judgment, the trial court apportioned Appellees recovery as follows:

| | |
|---|---|
| Mario Perea, as representative of Jacob's estate | $307,760.22 |
| Mario Perea, individually | $347,283.82 |
| Max Perea | $347,283.82 |
| Tony Perea | $347,283.82 |
| George Perea | $347,283.82 |
| | |
| Total Judgment --- Southwest Regional Specialty Hospital | $1,696,895.50 |

---

[31]The jury found Pharmasource Healthcare, Inc. and Omnicare Inc., d/b/a Pharmasource Healthcare, Inc. (Pharmasource), ten percent negligent and Southwest Hospital ninety percent negligent.

[32]The jury awarded the estate the sum of $40,000 for pain and mental anguish, $107,228.15 for medical expenses and $12,490.25 for funeral and burial expenses.  In the entry of its judgment, the trial court reduced the recovery of medical expenses to $5,036.72 pursuant to the "paid or incurred" limitation contained in § 41.0105.

[33]The judgment also ordered that Appellees recover the sum of $63,343.44 from Pharmasource. Pharmasource did not appeal.

Thereafter, THI filed a motion for judgment notwithstanding the verdict, remittitur, and to modify, correct, or reform the judgment. The trial court denied THI's motion and its motion for reconsideration. This appeal followed.

## Discussion

THI asserts: (1) the trial court abused its discretion by using a broad-form jury instruction on negligence and proximate cause when Appellees sought survival and wrongful death damages; (2) the trial court abused its discretion by granting Appellees a trial amendment to assert an action for negligent credentialing/hiring because the amendment was prejudicial to the presentation of THI's defense; (3) Appellees' evidence was legally and factually insufficient to support a judgment on their claims of negligent credentialing/hiring and factually insufficient to support Appellees' claim of negligence, i.e., that THI's conduct proximately caused Jacob's death or the nurses at Southwest Hospital were negligent in the performance of their duties; (4) Appellees' evidence that THI was grossly negligent is legally and (5) factually insufficient; (6) the trial court abused its discretion by excluding evidence of the fact that THI had conducted an investigation related to Jacob's death; and (7) the trial court abused its discretion as a matter of law by failing to apply statutory damage caps in sections 41.008(b) and 74.301(b) of the Texas Civil Practice and Remedies Code.

### I.    Jury Instruction

#### A.    Standard of Review

We review a trial court's decision to submit or refuse a particular jury instruction under an abuse of discretion standard. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). *See In the Interest of V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). Although a

24

trial court has great latitude and considerable discretion to determine necessary and proper jury instructions; *see* Tex. R. Civ. P. 277; *H.E. Butt Grocery Company v. Bilotto*, 985 S.W.2d 22, 23 (Tex. 1998), the trial court abuses its discretion if "the court acts arbitrarily, unreasonably or without reference to guiding principles of law." *McWilliams v. Masterson*, 112 S.W.3d 314, 317 (Tex.App.--Amarillo 2003, pet. denied).

When a trial court refuses to submit a requested instruction on an issue raised by the pleadings and evidence, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict. *Shupe*, 192 S.W.3d at 579 (citing *Tex. Workers Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000)). Further, omission of an instruction is harmful, or reversible error, only if the omission probably caused the rendition of an improper judgment; Tex. R. App. P. 44.1(a), 61.1(a); *see Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex. 2003); and is harmless "when the findings of the jury in answer to other issues are sufficient to support the judgment." *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980). *See City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995) (a jury question may be immaterial, or harmless, "when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict"). Whether harm exists is viewed in the context of the whole charge. *Boatland*, 609 S.W.2d at 749-50.

### B. Wrongful Death and Survival Actions

The Texas Survival Statute permits a decedent's heirs, legal representatives, and estates to bring actions for personal injuries the decedent suffered before his death; s*ee* Tex. Civ. Prac. & Rem. Code Ann. § 71.021 (Vernon 2008), while the Texas Wrongful

Death Act confers a cause of action upon the surviving spouse, children, and parents of a decedent for their damages resulting from the decedent's death. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 71.002, 71.004 (Vernon 2008).

To establish a cause of action under either statute, the claimant must establish a death and the occurrence of a wrongful act. *Mayer v. Willowbrook Plaza Ltd. Partnership*, 278 S.W.3d 901, 909 (Tex.App.--Houston [14th Dist.] 2009, no pet.). If negligence is alleged as the wrongful act, the claimant must show that the defendant's negligent act or omission was a substantial factor in bringing about the decedent's death, and without it, the decedent's death would not have occurred. *See Columbia Medical Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 246 (Tex. 2008) (citing *IHS Cedars Treatment Ctr., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004)).

The difference between the two statutes is the nature of the damages that may be recovered and who may collect them. The purpose of the Texas Survival Statute is "to continue a decedent's cause of action beyond death to redress decedent's estate for decedent's injuries that occurred before he died." *Borth v. Charley's Concrete Co.*, 139 S.W.3d 391, 395 (Tex.App.--Fort Worth 2004, pet. denied). *See* Tex. Civ. Prac. & Rem. Code Ann. § 71.021 (Vernon 2008). On the other hand, the purpose of the Wrongful Death Act is to permit a surviving husband, wife, child, and parents of the decedent to bring a cause of action to redress their injuries resulting from the decedent's death. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 71.002, 71.004, 71.010 (Vernon 2008).

Here, the gist of Appellees' action is that Southwest Hospital's nurses wrongfully administered two doses of Ativan to Jacob proximately causing his death. Jacob's

26

estate sought to recover Jacob's damages for injuries he suffered prior to his death[34] and Jacob's sons sought to recover damages they suffered because of his death.[35] Thus, in order to recover, Appellees were required to prove THI breached a duty owed to Jacob and the breach proximately caused the damages sought by Jacob's estate and sons. *Hogue,* 271 S.W.3d at 246.[36]

To determine whether Southwest Hospital was negligent, the trial court chose to charge the jury with the Texas Pattern Jury Charge or Broad Form Charge for Joint Submission of Negligence and Proximate Cause. *See* STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES--GENERAL NEGLIGENCE; INTENTIONAL PERSONAL TORTS, PJC 4.1 (2008). Although the Texas Pattern Jury Charges are not "law," they are heavily relied upon by bench and bar and based on what the State Bar Committee perceives the present law to be. *H. E. Butt Co. v. Bilotto,* 928 S.W.2d 197, 199 (Tex.App.--San Antonio 1996), *aff'd,* 985 S.W.2d 22 (Tex. 1998). *See Borden, Inc. v. Price,* 939 S.W.2d 247, 254 (Tex.App.--Amarillo 1997, writ denied).[37]

---

[34]In the Fifth Amended Original Petition, Jacob's estate sought damages for personal injury including physical pain and suffering, physical impairment, mental anguish, reasonable and necessary medical expenses, and funeral and burial expenses.

[35]In the Fifth Amended Original Petition, Jacob's sons sought damages for the loss of Jacob's love, counsel, companionship, and care*, i.e.,* mental anguish, emotional pain, torment, and mental suffering.

[36]In Texas, a cause of action for negligence requires three elements: (1) a legal duty owed by one person to another; (2) breach of that duty; and (3) damages proximately caused by the breach. *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002).

[37]Rule 277 of the Texas Rules of Civil Procedure provides that "the court shall, whenever feasible, submit the cause upon broad-form questions." Tex. R. Civ. P. 277. In *Texas Dep't of Human Services v. E.B.*, 802 S.W.2d 647 (Tex. 1990), the Texas Supreme Court interpreted the phrase "whenever feasible" as mandating broad-form submission "in any and every instance in which it is capable of being accomplished." *Id.* at 649.

The trial court's charge instructed the jury that, absent a proper legal definition for a term, the jury should attribute the "meaning commonly understood" to the words in the charge. Given the facts of this case and the similarity in the meanings of the terms "injury" and "death," as a precipitant to damages, we cannot say that, as a matter of law, a reasonable juror would have been misguided by the trial court's instruction. This is particularly so when the vast majority of the evidence at trial, both testimonial and documentary, was related to Jacob's manner of death and whether the Ativan dosage caused his death. In fact, during the trial court's hearing on the jury instructions, THI's counsel affirmatively stated that "[t]he only evidence of injury is death."

Further, while a Comment to PJC 4.1 addressing use of the terms "occurrence" or "injury" suggests that "[i]n a case involving death, the word 'death' *may* be used instead of 'injury'"; (emphasis added), this Comment addresses circumstances where there may be evidence of a plaintiff's negligence that is "injury-causing" or "injury-enhancing" but not "occurrence-causing." This Comment is inapplicable insofar as THI points to no evidence of record establishing that any negligence by Jacob, or by any other third party, may have either caused or enhanced his injury or death. Furthermore, THI did not request an issue attributing any negligence to Jacob.

Neither did the trial court abuse its discretion by failing to issue two instructions, i.e*.,* one using the word "injury" and one using the word "death." While trial courts should obtain fact findings on all theories pleaded and supported by the evidence, a trial court is not required to, and should not, confuse the jury by submitting differently worded questions that call for the same factual finding. *See Star Enterprise v. Marze*, 61 S.W.3d 449, 459 (Tex.App.--San Antonio 2001, pet. denied). Questions are

28

duplicitous if they embrace the same fact question, whether identical in language or merely similar in form. *Miller v. Wal-Mart Stores*, 918 S.W.2d 658, 664 (Tex.App.--Amarillo 1996, writ denied) (citing *Holmes v. J.C. Penney Company*, 382 S.W.2d 472, 473 (Tex. 1964)).  Here, either "injury" or "death" would have been appropriate terms for the negligence instruction.  Given the trial court's broad discretion in submitting jury questions, we cannot say the trial court abused its discretion by choosing the term "injury" over "death."

Finally, even if use of the term "injury" rather than "death" were error, the answers sought by Southwest Hospital can be found in Questions 3(c) and 4 through 7. While Question 1 sought to establish whether THI's conduct negligently caused Jacob's injury, Questions 3(c), and 4 through 7, sought to establish damages resulting from his death.[38]  Moreover, THI fails to offer any evidence establishing that use of the term "injury" rather than "death" caused rendition of an improper judgment.  Accordingly, THI's first issue is overruled.

## II.    Trial Amendment

During their case-in-chief, Appellees confronted Espinoza with the Colorado Board of Nursing's stipulated order and examined him without objection.[39]  Thereafter,

---

[38]Southwest Hospital's objection to the charge at trial was that, if the jury believed the hospital caused an injury to Jacob but not his death, "the wrongful death beneficiaries would not be entitled to recover." Question 3(c) asked what sum of money would compensate Jacob for damages he would have for funeral and burial expenses, while Questions 4 through 7 asked what sum of money "would fairly and reasonably compensate [Jacob's sons] for [their] damages, *if any, resulting from the death of Jacob Perea.*" (Emphasis added).  Thus, although the jury may have found Southwest Hospital negligently caused Jacob's injury, these damage instructions reminded the jury that they were limited to damages resulting from Jacob's death.

[39]During THI's examination, Espinoza testified he "[could] not think of a time he ever wrote an order for a controlled substance such as Ativan when he had not first gotten the order from a doctor."  Appellees

when Appellees sought to amend their petition to assert a negligent credentialing/hiring claim against THI, THI objected that (1) Appellees were pleading a cause of action for which there was no recovery because there were no damages; (2) the evidence was irrelevant because Espinoza worked as a Licensed Practical or Vocational Nurse in Colorado, not as a Registered Nurse; and (3) evidence of Espinoza's disciplinary proceeding six years earlier was irrelevant. THI did not seek a continuance.

Under Rule 66 of the Texas Rules of Civil Procedure, a trial court may not refuse a trial amendment unless (1) the opposing party presents evidence of surprise or prejudice, or (2) the amendment asserts a new cause of action or defense and thus is prejudicial on its face and the opposing party objects to the amendment. *Hart v. Moore,* 952 S.W.2d 90, 95 (Tex.App.--Amarillo 1997, writ denied) (citing *Greenhalgh v. Service Lloyds Insurance Co.*, 787 S.W.2d 938, 939 (Tex. 1990)). *See The State Bar v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex.) (*per curiam*) (decision to permit or deny trial amendment rests in sound discretion of trial judge if amendment asserts new cause of action or defense and thus prejudicial on its face), *cert. denied,* 512 U.S. 1236, 114 S.Ct. 2740, 129 L.Ed.2d 860 (1994).[40] The opponent of the trial amendment has the burden of showing surprise or prejudice, and "[a] motion for continuance based upon

---

sought to impeach this testimony with the stipulated order wherein he had been disciplined by the Colorado Board of Nursing in 1996 for administering Ativan to a patient without a physician's order.

[40]*See also Allstate Prop. & Cas. Ins. Co. v. Guiterrez*, 281 S.W.3d 535, 539 (Tex.App.--El Paso 2008, no pet.); (a trial amendment may be prejudicial on its face, "but this does not make it prejudicial as a matter of law"); *American Title Company of Houston v. Bomac Mortgage Holdings, L.P.*, 196 S.W.3d 903, 909 (Tex.App.--Dallas 2006, no pet.) (decision to permit or deny trial amendment rests in sound discretion of trial court if amendment asserts new cause of action or defense); *Deutsch v. Hoover, Bax & Slovacek*, L.L.P., 97 S.W.3d 179, 186 (Tex.App.--Houston [14th Dist.] 2002, no pet.) ("An amended pleading asserting a new defense is not prejudicial as a matter of law; the amendment must be evaluated in the context of the entire case.").

the ground of surprise or prejudice is essential before the filing of a trial amendment will constitute reversible error." *Resolution Trust Corp. v. Cook*, 840 S.W.2d 42, 46 (Tex.App.--Amarillo 1992, writ denied). *See Jones v. Blackmon*, 419 S.W.2d 434, 440 (Tex.Civ.App.--Houston [14th Dist.] 1967, writ ref'd n.r.e.) (trial court does not ordinarily abuse its discretion when party opposing an amendment does not ask for a postponement).

Appellees' trial amendment was made during their case-in-chief. THI had yet to put on its defense. THI did not object to the amendment because of surprise or prejudice, nor did it seek a continuance. Rather, THI asserted that the proposed action was legally deficient and/or the underlying evidence in support of the action was irrelevant. Having failed to object to the amendment based upon surprise or prejudice, THI may not now assert these grounds on appeal.[41]

To preserve error on appeal, a party must make a timely, specific objection or motion to the trial court that states the grounds for the ruling sought with sufficient specificity and complies with the rules of evidence and procedure. *See* Tex. R. App. P. 33.1(a). Because THI presents this argument for the first time on appeal, it is waived. *Id. See Marine Transp. Corp. v. Methodist Hosp.*, 221 S.W.3d 138, 147 n.3 (Tex.App.– Houston [1st Dist.] 2006, no pet.). THI's second issue is overruled.

---

[41]THI contends surprise was asserted when its counsel attempted to exclude the testimony of Deanna Graves, Southwest Hospital Administrator, on the issue of negligent credentialing because she was not on Appellees' witness list. THI's objection to Graves testifying was made pursuant to Rule 193.6 of the Texas Rules of Civil Procedure, not Rule 66. Further, the trial court had already held a hearing on Appellees' motion to amend and granted the Rule 66 motion prior to THI's Rule 193.6 objection. Moreover, Appellees' attorney informed THI four days prior to calling Graves to testify that she intended to call Graves to discuss Espinoza's employment file, and Graves was listed as a potential witness on Pharmasource's witness list for trial.

### III.    Recovery Under Appellees' Negligence Theories

THI asserts Appellees' evidence at trial in support of their negligent credentialing/hiring claim is both legally and factually insufficient, i.e*.,* Appellee failed to establish Southwest Hospital's conduct breached any standard of care in hiring Espinoza or that any negligence in hiring Espinoza caused Jacob's death.  THI also asserts Appellees' evidence at trial in support of their negligence claim against Southwest Hospital is factually insufficient, i.e., Appellees' expert evidence that Southwest Hospital's negligence caused Jacob's death, when compared to THI's expert evidence, is so weak that it is clearly wrong and manifestly unjust.

### A.  Standard of Review

In conducting a legal sufficiency review,[42] we must consider the evidence in the light most favorable to the challenged finding, indulge every reasonable inference to support it; *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005),[43] and credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not**.**  *Id.* at 827.  A challenge to legal sufficiency will be sustained when, among other things, the evidence offered to establish a vital fact does not exceed a scintilla.[44]  *Kroger Tex. Ltd. P'ship v. Suberu,* 216 S.W.3d 788, 793 (Tex. 2006).  Furthermore, so long as the evidence falls within the zone of reasonable

---

[42]When both legal and factual sufficiency challenges are raised on appeal, the reviewing court must first examine the legal sufficiency of the evidence.  *See Glover v. Tex. Gen. Indemnity Co.,* 619 S.W.2d 400, 401 (Tex. 1981).

[43]"[T]he test for legal sufficiency should be the same for summary judgment, directed verdicts, judgments notwithstanding the verdict and appellate no-evidence review."  168 S.W.3d at 823.

[44]Evidence does not exceed a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" that the fact exists.  *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

disagreement, we may not invade the factfinding role of the jurors, who alone determine the credibility of witnesses, the weight to be given their testimony, and whether to accept or reject all or part of their testimony. *Wilson,* 168 S.W.3d at 822.

In reviewing a factual sufficiency challenge, we consider all the evidence and set aside a finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). If, as here, the appellant is challenging the factual sufficiency of the evidence to support a finding on an issue on which the other party had the burden of proof, we must overrule the complaint unless, considering all the evidence, the finding is clearly wrong and manifestly unjust. *See Santa Fe Petroleum, L.L.C. v. Star Canyon Corp.*, 156 S.W.3d 630, 637 (Tex.App.--Tyler 2004, no pet.) (citing *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965)). Inferences may support a judgment only if they are reasonable in light of all the evidence; id., and, again, the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet,* 61 S.W.3d 599, 615-16 (Tex.App.--Houston [14th Dist.] 2001, pet. denied). In addition, the mere fact that we might have reached a different conclusion on the facts does not authorize us to substitute our judgment for that of the jury. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). *See Richmond Condominiums v. Skipworth Commercial Plumbing, Inc.*, 245 S.W.3d 646, 658 (Tex.App.--Fort Worth 2008, no pet.).

### B. Analysis

### 1. Negligent Credentialing/Hiring

Here, although Appellees' claim is that Southwest Hospital was negligent in credentialing or hiring Espinoza, the thrust of the claim is that the health care facility failed to protect its patient--a claim that "necessarily implicate[s] the acceptable standards of safety pursuant to the definition of health care liability claim."[45] *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 855 (Tex. 2005).[46]

Negligent hiring claims are both health care liability claims, *see In Re McAllen Medical Center Inc.*, 275 S.W.3d 458, 462 (Tex. 2008), and "simple negligence causes of action." *Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 49 (Tex.App.--Fort Worth 2002, no pet.). To establish a claim for negligent hiring, supervision and retention, a plaintiff must prove the following elements: (1) a duty to hire, supervise, and retain competent employees; (2) an employer's breach of the duty; and (3) the employer's breach of the

---

[45]A "health care liability claim" is as follows:

> [A] cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

Tex. Civ. Prac. & Rem. Code Ann. § 74.001(13) (Vernon 2005).

[46]"The competent selection and review of medical staff is precisely the type of professional service a hospital is licensed and expected to provide, for it is in the business of providing medical care to patients and protecting them from unreasonable risk of harm while receiving medical treatment . . . [T]he competent performance of this responsibility is 'inextricably interwoven' with delivering competent quality medical care to hospital patients. *Diversicare*, 185 S.W.3d at 853 (quoting *Bell v. Sharp Cabrillo Hosp.,* 212 Cal.App.3d 1034, 260 Cal. Rptr. 886, 896 (Cal.Ct.App. 1989)). "It follows that proper staffing for the care and protection of patients is related to and part of the rendition of health care." *Holguin v. Laredo Regional Medical Center*, 256 S.W.3d 349, 356 (Tex.App.--San Antonio 2008, no pet.). "Without safe, reliable staffing, health care would obviously be compromised because 'training and staffing policies and supervision and protection' of patients 'are integral components of . . . health care services.'" *Id.* (quoting *Diversicare*, 185 S.W.3d at 850) (collected cases cited therein)).

duty proximately caused the damages sued for.  *See LaBella v. Charlie Thomas, Inc.,* 942 S.W.2d 127, 137 (Tex.App.--Amarillo 1997, writ denied).

An employer is liable for negligent hiring, supervision, or retention when proof is presented that the employer hired an incompetent or unfit employee whom it knew or, by the exercise of reasonable care, should have known was incompetent or unfit, thereby creating an unreasonable risk of harm to others.  *See Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex.App.--Fort Worth 2008, no pet.).  Because Appellees' claim of negligent credentialing and hiring is cognizable under chapter 74 of the Texas Civil Practice and Remedies Code; *Garland Community Hosp. v. Rose*, 156 S.W.3d 541, 544, 545-46 (Tex. 2003), expert testimony is necessary to establish the elements of the claim.  *Holguin*, 256 S.W.3d at 356.

THI asserts Appellees failed to produce more than a scintilla of probative evidence that THI breached its standard of care by hiring Espinoza and, if so, any breach by THI proximately caused Jacob's injuries.[47]  Appellees' expert, Dr. Haines, testified on direct examination, without objection, that a director of nurses and hospital administrators should have some involvement in assuring that nurses on their staff will not write orders without a doctor's permission.  He testified that, when hiring nurses, nursing directors, and administrators they should look at a nurse's past employment record and determine whether they had problems or troubles at prior nursing facilities.

---

[47]Southwest Hospital does not assert that it lacked a duty to hire and supervise competent nurses.

35

He further opined that nursing directors and hospital administrators had a duty to research the background of people they hired.[48]

Dr. Haines also testified that, if a nurse went "rogue" and administered prescription drugs without the authority to do so, the nurse should lose their license. Nurse Jahomo testified that, if she wrote an order for a patient's medication without a doctor's permission, she would be in violation of her nursing license. She also testified that, administering medication without the proper approval would be extremely dangerous for the patient and could cause the patient's death if there were an adverse effect. Nurse Graham testified that, in December 2004, Espinoza had a reputation for being a "rogue" nurse and agreed with Nurse Jahomo that a nurse who administered prescription drugs without proper authority should lose their license.

Espinoza testified that, prior to being employed at Southwest Hospital, he had been disciplined by the Colorado Board of Nursing for administering Ativan to a patient without a physician's prior approval. The Colorado Board of Nursing placed Espinoza on probation with specific tasks to be completed prior to reinstatement of his nursing license. He testified he relocated to Texas,[49] began practicing as a nurse, and failed to comply with *any* conditions of his Colorado probation.

---

[48]An employer owes a duty to its other employees and to the general public to ascertain the qualifications and competence of the employees it hires, especially when the employees are engaged in occupations that require skill or experience and that could be hazardous to the safety of others. *JTM Materials, Inc.,* 78 S.W.3d at 50 (citing *Wise v. Complete Staffing Servs., Inc.,* 56 S.W.3d 900, 902 (Tex.App.--Texarkana 2001, no pet.)). *See LaBella*, 942 S.W.2d at 137 ("Texas courts have long recognized a master's duty to make inquiry into the competence and qualifications of those he considers for employment.").

[49]Espinoza testified he did not disclose the Colorado Board of Nursing's disciplinary proceedings or their order to Texas authorities. Under the Texas Nursing Practice Act, a person is subject to "denial of license or to disciplinary action . . . for . . . revocation, suspension, or denial of . . . the person's license or privilege to practice nursing in another jurisdiction. Tex. Occ. Code Ann. § 301.452(b)(8) (Vernon 2004).

Espinoza further testified that in 1997 he was hired at Highland Medical Center where his supervising nurse was Connie Long. He testified that he spoke to Long about his probation in Colorado and she hired him despite knowing that he had his license suspended in Colorado for administering Ativan without a doctor's approval.[50] After Long moved to Southwest Hospital to take a position as Director of Nursing, she recruited Espinoza to join her and, in 2002, Espinoza began working at Southwest Hospital. Espinoza testified that, although Long was by then aware of his stipulated probation order with the Colorado Board of Nursing, she had no problem putting him on the floor and permitting him to dispense medications to patients. While he was employed at Southwest Hospital, he testified his evaluations were always above average.

Although Espinoza testified he wrote the order to administer Ativan to Jacob after receiving approval from Nurse Graham by telephone, the jury could reasonably infer from Dr. Rice's and Nurse Graham's testimony that Espinoza wrote the order himself without prior approval. Nurse Graham testified that she did not receive any calls from Espinoza that day and had no doubt that she did not approve the order to administer Ativan to Jacob.

Although the testimony regarding who approved the administration of Ativan to Jacob was conflicting, the jury's verdict indicates they credited and gave weight to Nurse Graham's testimony. *See Wilson,* 168 S.W.3d at 819 ("Jurors are the sole judges of the credibility of witnesses and the weight to give their testimony. They may

---

[50]Espinosa testified that he went to work for Highland in May of 1997. Although the Colorado stipulated probation order was not issued until September 1997, his testimony was unclear as to when proceedings were initiated before the State Board of Nursing in Colorado.

choose to believe one witness and disbelieve another" and "[r]eviewing courts cannot impose their own opinions to the contrary."). *See also Texas Drydock, Inc. v. Davis*, 4 S.W.3d 919, 924 (Tex.App.--Beaumont 1999, no pet.). Moreover, "[c]ontroverted trial issues are properly within the province of the jury if reasonable minds could differ as to the truth of the controlling facts." *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex. 1978).

Given this evidence, we conclude there was more than a scintilla of evidence establishing that THI breached its duty to hire nurses that were competent or fit for employment. The jury could reasonably infer from the evidence that THI, through Long, hired Espinoza knowing he was on probation due to disciplinary proceedings in another state, for conduct that reasonably endangered the health and safety of patients entrusted to his care. The evidence also reflects Long did so without taking any precautions to assure that Espinoza would not commit the same violations again. Further, Espinoza was permitted to medicate patients and then ultimately was placed in a managing position with responsibilities that included supervising authority over nurses, advising physicians or their assistants on medications, writing telephone orders for the administration of drugs to patients, and instructing nurses on which drugs to administer.

THI points to Dr. Rice's answer to a hypothetical question as evidence that Southwest Hospital was not negligent in hiring Espinoza. Dr. Rice testified he would not consider a previously disciplined nurse unfit if that nurse had complied with the rehabilitative conditions established by the board of nursing and had worked for six years at two different hospitals without further incident. Notwithstanding this statement,

the jury was free to conclude that Espinoza never complied with the rehabilitative conditions of the Colorado order.

THI also asserts that the passage of six years time between the act that caused the Colorado Board of Nursing to place Espinoza on probation and Jacob's injury rendered the Colorado Board of Nursing Order irrelevant. This assertion overlooks the principle that, "[w]hen a plaintiff's credentialing [or hiring] complaint centers on the quality of the [patient's] treatment . . . the hospital's acts or omissions in credentialing [or hiring] are inextricably intertwined with the patient's medical treatment and the hospital's provision of health care." *Rose*, 156 S.W.3d at 546. The *Rose* court stated, in pertinent part, as follows:

> Rose's is a case in point. She complains of acts and omissions that occurred, in significant part, during her treatment. Rose alleges that the Hospital acted negligently and maliciously in allowing Dr. Fowler to perform Rose's surgeries. . . . These decisions necessarily occurred during Rose's treatment. It is not necessary, however, to dissect Rose's claims in to pre-treatment and post-treatment components. *Regardless of when the acts occurred, the allegations all revolve around the same basic premise: that the Hospital put Rose at risk by allowing Dr. Fowler to treat her.* It makes no sense to conclude that some credentialing [or hiring] claims are subject to the MLIIA and others are not, depending on what point in time the credentialing decision occurred.

156 S.W.3d at 545. (Emphasis added). Accordingly, we cannot say that the passage of time or Espinoza's prior employment, as a matter of law, absolves THI of any breach of its duty to hire and retain competent nurses.

Regarding causation, here, Espinoza's conduct, as it pertains to Jacob, is identical to the wrongful conduct he committed in Colorado, i.e*.,* administering Ativan without required approvals. The evidence supports the conclusion that, although Long was aware of Espinoza's stipulated probation order, she never reported that fact to the

39

Texas nursing authorities, knowing it would affect his employability as a nurse licensed to practice in Texas. The evidence of record further indicates that not only did Long not take precautions to prevent similar conduct from occurring again, she promoted Espinoza to a position of authority with sufficient power to make it relatively easy for him to engage in the same errant behavior.

The jury's findings that THI was negligent in hiring Espinoza and that negligence caused Jacob's injury are not so against the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. Accordingly, we cannot say that the evidence was either legally or factually insufficient to support the jury's verdict under Appellees' negligent credentialing/hiring theory of recovery.

### 2. Medical Malpractice - Negligence

THI next contends the evidence is factually insufficient to support the jury's finding that THI's negligence, through its employees, in administering two doses of Ativan to Jacob proximately caused his death.[51] In support, THI asserts the credentials of its expert, Dr. Hail, are superior to Dr. Haines's credentials and the opinions of its experts, Dr. Hail and Dr. Rice, are entitled to more weight than Dr. Haines's opinions.

While proximate cause in a medical malpractice case must be based upon reasonable medical probability; *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995), "[t]he quantum of proof required is simply 'that it is more likely than not that the ultimate harm or condition resulted from such negligence." *Kramer v. Lewisville Mem. Hosp.,* 858 S.W.2d 397, 400 (Tex. 1993). A plaintiff is not required to exclude

---

[51]THI does not assert that Southwest Hospital's nurses owed no duty to properly care for and treat Jacob or that they did not breach their duty of care.

every other reasonable hypothesis; *Marvelli v. Alston*, 100 S.W.3d 460, 470 (Tex.App.--Fort Worth 2003, pet. denied), and more than one proximate cause may exist. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001) (question is whether the wrongful act "was 'a' proximate cause, not 'the' proximate cause" of decedent's death).

To satisfy the causal element of proximate cause, the wrongful act need only be a substantial factor[52] in bringing about the harm. *Southwest Key Program, Inc. v. Gil-Perez*, 81 S.W.3d 269, 274 (Tex. 2002); *Sisters of St. Joseph of Texas, Inc. v. Cheek*, 61 S.W.3d 32, 35 (Tex.App.--Amarillo 2001, pet. denied). Further, whether a particular act of negligence is a cause-in-fact of an injury is a particularly apt question for jury determination. *Farley v. MM Cattle Co.*, 529 S.W.2d 751, 756 (Tex. 1975). *See Tex. Dept. of Transp. v. Pate*, 170 S.W.3d 840, 848 (Tex.App.--Texarkana 2005, pet. denied).

Any objection to the qualifications or methodology of Appellees' expert witness, Dr. Haines, was waived at trial because THI made no objection to his testimony. To preserve a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial or when the evidence is offered. *See Volkswagon of America, Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004); *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 252 (Tex. 2004). Further, whether an expert's testimony is credible or not is best left to the jury. *See Pascouet*, 61 S.W.3d at 615-16.

---

[52]"The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause." *Givens v. M&S Imaging Partners, L.P.,* 200 S.W.3d 735, 738-39 (Tex.App.--Texarkana 2006, no pet.) (quoting RESTATEMENT (SECOND) OF TORTS § 431 cmt. a (1965)). *See Healthcare Centers of Texas, Inc. v. Rigby*, 97 S.W.3d 610, 625 (Tex.App.--Houston [14th Dist.] 2002, pet. denied).

41

Dr. Haines practiced family medicine for twenty-three years. His practice is comprised of approximately thirty percent of patients over sixty-five years of age. He has cared for patients taking benzodiazepines, the same class of drug as Ativan. He testified that common side effects from Ativan range from sedation and respiratory depression to agitation and confusion. He also testified Ativan's manufacturer listed respiratory depression as the top adverse reaction to the drug[53] and an overdose of Ativan can cause respiratory depression to the extent a person's heart stops.

Although Jacob did not undergo a specific medical test to determine whether he had an allergy to Ativan, Dr. Haines testified Jacob's medical records indicated that he "reacted badly" to Ativan prior to being admitted to Southwest Hospital, i.e., quit breathing after receiving Versed, another benzodiazepine, in preparation for a recent MRI at Covenant and experienced agitation/confusion when medicated by Ativan as illustrated by his physicians' orders labeling Ativan as an allergy for Jacob.

Dr. Haines opined that, after Jacob received the second dose of Ativan in the early morning hours of December 19, he was overdosed. His breathing became increasingly more shallow until there was insufficient oxygen to support the functions of his heart or brain causing his heart to go into arrhythmia until he suffered a cardiac arrest and finally quit breathing altogether due to respiratory depression.

Dr. Hail disagreed. She testified that Jacob died of a heart attack based upon a blood test taken nearly an hour after Jacob was found unresponsive and was transferred to Covenant. She also based her opinion on telemetry strips recorded at

---

[53]Nurse Joiner testified Ativan is a Central Nervous System suppressant and the number one side effect of Ativan is decreasing a patient's ability to breathe.

Covenant on December 12 (before Jacob was transferred to Southwest Hospital) and on December 19 (after Jacob was returned from Southwest Hospital.) She opined that, based upon her experience in the emergency room, Ativan does not cause respiratory depression and two milligrams of Ativan was not an overdose.

Contrary to Dr. Hail's opinion, however, hospital documentation showed Jacob's heart condition was stable prior to receiving the two doses of Ativan. When Jacob was transferred from Covenant to Southwest Hospital on December 12, his discharge summary noted that he was "released in stable condition, neurologically intact [with] a stable cardiac evaluation." No medical devices were utilized to monitor Jacob's cardiac condition while he was at Southwest Hospital.

Prior to receiving Ativan on December 18, Jacob's Progress Note indicated he was negative for shortness of breath, negative for chest pain, and negative for nausea or vomiting. Although the December 18 Progress Note indicated he was experiencing atrial fibrillation, the Progress Note stated he was "on Coumadin as well as Lorenex, continue these and *recheck 12/20/04*." (Emphasis added). Further, only hours before receiving either dose of Ativan on December 18 and 19, Nurse Graham checked Jacob's breathing status and vital signs. She noted his oxygen saturations and respiratory rate and "didn't see anything abnormal."

Approximately six hours after receiving what Dr. Haines termed an overdose of Ativan, Jacob was discovered with no vital signs and unresponsive. On subsequent examination by Dr. Wheeler at Covenant, he noted Jacob was "currently obtunded, probably secondary to [an] Ativan injection." Dr. Wheeler noted that "allergies noted on [Southwest Hospital's] history show morphine and Ativan," and that Jacob had "recently

43

been given Ativan 2 mg IV push q. 4 hours p.r.n., he has received two doses of this over the last 24 hour period." Based upon Jacob's medical records in addition to his experience, Dr. Haines opined that, prior to receiving Ativan, Jacob's medical records did not show he was experiencing irregular heart rhythms that were dangerous or symptoms associated with a heart attack such as chest pains, nausea, or shortness of breath prior to his coding.

Dr. Hail also testified that, if Jacob was having an allergic reaction to Ativan, the manifestation of his symptoms would have occurred within minutes of taking the Ativan rather than hours later. Dr. Haines, on the other hand, testified that Jacob did not go into anaphylactic shock after receiving the Ativan which, in his opinion, could occur within an hour or two of taking the Ativan, but instead suffered from an adverse reaction or side effect due to his sensitivity to Ativan. He testified the effect of the multiple doses of Ativan on Jacob was cumulative, i.e., his respiratory distress or adverse reaction slowly increased as the medication was digested and absorbed into the bloodstream until he was unable to breathe.

Dr. Haines testified that Jacob arrested four hours after the MRI at Covenant on December 3 when, prior to the MRI, he had received Versed, a member of the benzodiazepine family of drugs and faster acting than Ativan. In his opinion, Jacob suffered a similar adverse reaction at Southwest Hospital where he was given multiple two milligram doses of Ativan, one at 4:00 p.m. on December 18 and another at 1:30 a.m. on December 19, and arrested approximately five hours and forty-five minutes after the second dose of Ativan at 7:15 a.m.

44

Dr. Rice opined that Jacob died of his underlying medical conditions. He pointed to the same blood test and telemetry readings relied on by Dr. Hail. Although he testified there was no scientific evidence that Ativan causes respiratory depression, he conceded that respiratory failure is a side effect of Ativan reported by its manufacturer. He also testified that complications from taking a drug of the benzodiazepine class, which includes Ativan, includes obtundation, as noted by Dr. Wheeler on Jacob's admission on December 19, i.e*.,* "a level of consciousness before a coma."

Dr. Rice testified that he did not want Jacob to receive Ativan because (1) it was well known in literature that Ativan in geriatric patients or severely ill patients doesn't calm them down like it's supposed to but may make the patient wilder and more agitated; (2) Jacob's son had communicated that Jacob had these reactions to the drug; and (3) he didn't want to raise Jacob's heart rate because he was concerned that the stimulus might cause Jacob to suffer a heart attack. For all these reasons, Dr. Rice simply "didn't want [Jacob] to have it." This testimony supports Dr. Haines's conclusion that the two doses of Ativan caused Jacob to arrest.

The jury has broad latitude to infer proximate cause from the evidence and the circumstances surrounding the injury-producing act especially when it is not possible to produce direct proof of proximate cause or lack of proximate cause. *J.K. & Susie Wadley Research Inst. & Blood Bank v. Beeson*, 835 S.W.2d 689, 698 (Tex.App.--Dallas 1992, writ denied) (citing *Harris v. LaQuinta-Redbird Joint Venture*, 522 S.W.2d 232, 236 (Tex.Civ.App.--Texarkana 1975, writ ref'd n.r.e.).

Here, aided by expert testimony, the jury was free to determine that the administration of Ativan caused Jacob to arrest because he was stable and

experiencing no symptoms of a heart attack prior to being injected with the two doses of Ativan, yet arrested only hours after having been given the drug. In addition, that Jacob's vital signs were not being electronically monitored at Southwest Hospital as they had been previously at Covenant, his vital signs were not being taken during nurse shift visitations, and his December 18 progress note indicated it was not necessary to check his heart medications until December 20 prior to receiving the Ativan, were also some evidence from which the jury could reasonably infer that Jacob's heart condition was not critical.

Similarly, scientific principles provided by Dr. Haines establish a traceable chain of causation from the condition--Jacob's arrest--back to the event--the administration of multiple doses of Ativan. Having considered all the evidence, we cannot say that the jury's finding that THI's negligence caused Jacob's injuries or death was so against the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. Accordingly, THI's third issue is overruled.

### IV. & V.        Gross Negligence -- Sufficiency of Evidence

Appellees argued to the jury that THI was grossly negligent in causing harm to Jacob through the administration of Ativan by either Nurse Jahomo or Espinoza and THI ratified or approved the act. Appellees further argued that THI was grossly negligent, or reckless, for employing Espinoza because he was unfit.

THI asserts there was no clear and convincing evidence that: (1) Espinoza or Jahomo were aware of the risk involved in administering Ativan to Jacob and chose to proceed in conscious indifference to his safety; (2) THI ratified Espinoza's or Jahomo's

46

conduct, Espinoza was unfit to care for Jacob or THI was reckless in hiring him; or (3)

Espinoza's employment proximately caused Jacob's death.

## A.    Gross Negligence

To recover exemplary damages, a plaintiff must prove by clear and convincing

evidence[54] that the plaintiff's harm resulted from*, inter alia*, the defendant's willful act or

gross neglect.   Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a)(3), (b) (Vernon Supp.

2009).   Gross negligence is statutorily defined as an act or omission:

> (A) which when viewed *objectively* from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

> (B) of which the actor has actual, *subjective* awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11) (Vernon 2008).   (Emphasis added).

Thus, two elements comprise gross negligence.   First, viewed objectively from

the actor's standpoint, the act or omission complained of must depart from the ordinary

standard of care to such an extent that it creates an extreme degree of risk of harming

others.   *Harrison*, 70 S.W.3d at 784-86; *Universal Servs. Co. v. Ung*, 904 S.W.2d 638,

641 (Tex. 1995).[55]   Second, the actor must have actual, subjective awareness of the

---

[54]Evidence is "clear and convincing" if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2) (Vernon 2008).   "[E]vidence that does more than raise surmise or suspicion will not suffice unless it is capable of producing a firm belief or conviction that the allegation is true."  *Garza*, 164 S.W.3d at 621.

[55]"Extreme risk" is not "a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff."  *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 22 (Tex. 1994) (quoting *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 327 (Tex. 1993)).

risk involved and choose to proceed in conscious indifference to the rights, safety, or welfare of others. *See Harrison*, 70 S.W.3d at 785; *Ung*, 904 S.W.2d at 641.

## B.    Standard of Review

### 1.    Legal Sufficiency

In reviewing the legal sufficiency of the evidence under a clear and convincing standard, we look at all the evidence, in the light most favorable to the judgment, to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Garza*, 164 S.W.3d at 622 (citing *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002)). We presume that the trier of fact resolved disputed facts in favor of its findings if a reasonable trier of fact could do so, and disregarded any evidence a reasonable fact finder could have disbelieved or found to have been incredible. *Id.* at 627; *In the Interest of J.L.,* 163 S.W.3d 79, 85 (Tex. 2005). Further, "whenever the standard of proof at trial is elevated, [as here], the standard of appellate review must likewise be elevated." *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004).

### a.    Subjective Test -- Espinoza and Jahomo

Focusing on the second, or subjective, component,[56] what separates ordinary negligence from gross negligence is the defendant's state of mind; in other words, the plaintiff must show the defendant knew about the peril, but his acts or omissions demonstrate he or she did not care. *See Diamond Shamrock Ref. Co., L.P. v. Hall,* 168 S.W.3d 164, 172 (Tex. 2005); *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922 (Tex. 1981). It is this mental attitude of reckless indifference that permits a jury to find "that

---

[56]THI does not challenge on appeal whether Appellees met the objective component.

the defendant had decided to ignore the rights of others even in light of probable and threatened injury to them." *Williams v. Steves Indus., Inc.,* 699 S.W.2d 570, 573 (Tex. 1985). This subjective component may be established by circumstantial evidence. *See Harrison*, 70 S.W.3d at 785; *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998).

As discussed previously, the jury could reasonably infer from the evidence that Espinoza wrote the Ativan order for Jacob without the approval of either Dr. Rice or Nurse Graham. Viewed from the standpoints of Dr. Haines, Dr. Rice, Nurse Jahomo, and Espinoza, the administration of Ativan to a patient such as Jacob without a physician's approval could cause the patient's death. Dr. Rice testified that a nurse "out there writing orders without permission puts a patient in an extreme risk, [and] if put in an extreme risk, could suffer injury to a patient's life."

The magnitude of the injury, i.e., death, and the probability of that injury-- probable enough for Jacob's doctors at Covenant to immediately, repeatedly, and expressly enter into his chart that he had an "allergy" to Ativan to assure that he did not receive the drug, and the myriad of precautions that were supposed to be in place at Southwest Hospital to assure a patient does not receive a drug to which they have an allergy (for example: placing an allergy sticker on the patient's chart, affixing an allergy bracelet to the patient's wrist, multiple entries in the patient's chart, computerized medicine dispensing system with allergy warnings, twice daily entries in the Nurse Documentation Reports)[57]-- demonstrate that the administration of Ativan to Jacob

---

[57]Dr. Haines testified that Jacob's doctors entered into the medical records and past medical history multiple times that he was allergic to Ativan--"[h]is doctors did not want him to have it. I mean, it's very

without a physician's approval posed an extreme degree of risk.  *See Bush*, 122 S.W.3d at 855.

In fact, Espinoza agreed that it would be extremely dangerous to administer Ativan to a patient without a doctor's order and, after having been disciplined for an identical incident in Colorado, realized that he would put a patient in extreme risk of death if he were to do so again.  Here, the jury could reasonably infer from the evidence that Espinoza prescribed Ativan for Jacob without a physician's orders and Espinoza agreed that, "if he wrote the order [for Ativan], he would be consciously disregarding [Jacob's] health, safety and welfare."

The evidence need not show, as THI contends, that Espinoza had specific knowledge of Jacob's allergy or sensitivity to Ativan.  *See Harrison*, 70 S.W.3d at 786. Rather, the evidence need only be such that reasonable inferences of a conscious decision could be made.  *Id.*  Here, the jury's verdict is supported by evidence that Espinoza consciously countermanded Dr. Rice's order to treat Jacob with Zyprexia by prescribing Ativan knowing his decision could cost Jacob his life after having checked and knowing Jacob was allergic to the drug or not checking and not knowing, i.e., consciously indifferent to whether Jacob was allergic or not.

We find the evidence in this case is legally sufficient to support a finding that Espinoza had actual awareness of an extreme risk involved in prescribing Ativan for

---

simple."  He further testified that, when a patient reacts to drugs, "you do everything you can do to make sure the patient doesn't get the drug, because that is the worse [sic] thing that can happen.  You put somebody in the hospital, to take care of another problem, and then you give them something that kills them.  That is the worse [sic] thing you can do, you know."

Jacob without physician permission, proceeded to act with conscious indifference to that risk, and was, therefore, grossly negligent.[58]

### b.    Corporate Liability

A corporation may be liable in punitive damages for gross negligence only if the corporation itself commits gross negligence. *Ellender*, 968 S.W.2d at 921. Further, a corporation is grossly negligent if it authorizes or ratifies an agent's gross negligence, or if it is directly negligent in hiring an unfit agent. *Id.* A corporation may also be grossly negligent through the acts or inactions of a vice-principal. *Id.* at 922.[59] *See Bush*, 122 S.W.3d at 854; *Burk*, 616 S.W.2d at 922 (corporation's "conduct can be active or passive").

In determining whether acts are directly attributable to the corporate employer, we do not restrict our review to individual elements or facts but instead consider all the surrounding facts and circumstances to determine whether the corporation itself is grossly negligent. *Ellender*, 968 S.W.2d at 922. These facts and circumstances include reasonable inferences the fact finder can draw from what the corporation did or failed to do and the facts existing at relevant times that contributed to a plaintiff's alleged damages. *Id.* at 924.

---

[58]When judgment rests on multiple theories of recovery, we need not address all causes of action if any one theory is valid. *EMC Mortgage Corporation v. Jones*, 252 S.W.3d 857, 870-71 (Tex.App.--Dallas 2008, no pet.) (citing *Checker Bag Co. v. Washington*, 27 S.W.3d 625, 634 (Tex.App.--Waco 2000, pet. denied)). As such, we need not decide whether there was sufficient evidence to support a finding that any act or omission by Nurse Jahomo was grossly negligent.

[59]Such vice-principals include corporate officers; those who have authority to employ, direct, and discharge other employees; those engaged in performing the corporation's nondelegable or absolute duties, and those responsible for the management of the whole or a department or a division of the business. *Ellender,* 968 S.W.2d at 921 (citing *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997)).

From the evidence, the fact finder could reasonably infer that Espinoza was unfit at the time he was recruited by Long, Southwest Hospital's Director of Nursing, in 2002.[60] Espinoza testified that, at the time THI hired him, Long was aware his Colorado nursing license had been suspended for administering Ativan to a patient without a doctor's approval and, despite this knowledge, Espinoza was placed in a position at Southwest Hospital where he supervised nurses and initiated orders for prescribed medications.[61]

Further, Espinoza testified that in early 2005 (after Jacob's death) he informed Long that he was a drug addict and she continued to permit him to work at Southwest Hospital. Thereafter, Espinoza's addiction was permitted to progress until he was reported impaired--sleepy, sleep-walking, running into walls, falling asleep at patients' bedsides. Espinoza was misappropriating morphine and Demerol from Southwest Hospital's computerized medicine dispensing system and taking the medications himself without proper authorization while falsifying the information in the system to make it appear as if patients were taking the medication. Finally, on November 19, 2005, he inserted an external jugular venous catheter in a patient without proper authorization, performing a medical procedure outside the parameters of a nursing license. In late

---

[60]THI does not challenge on appeal whether Long is a vice-principal of Southwest Hospital.

[61]Espinoza was the charge, or supervising, nurse over Nurses Rosales and Joiner while they cared for Jacob. As a charge nurse, Espinoza supervised all floor nurses and directed them on how to best manage and care for patients. He assisted floor nurses when they had questions, difficulties, or trouble with patients. If he observed a problem on the floor, he was responsible for bringing the problem to the attention of hospital administrators.

December 2005, Espinoza was finally discharged by Long and Southwest Hospital administrator Graves.[62]

From this evidence, the jury could reasonably infer that Long consciously disregarded the danger she was exposing patients to by permitting a "rogue" nurse, ostensibly unrepentant up to the time of his trial testimony,[63] to supervise the care of patients in general, and Jacob in particular. Furthermore, when this evidence is coupled with Long's initial decision to hire Espinoza despite knowing of the suspension of his nursing license in Colorado, the jury could reasonably infer that Long continued a pattern of turning a blind eye toward Espinoza's misconduct, beginning with his original hiring and eventually culminating in his termination in December 2005.

Looking at the evidence in a light most favorable to the judgment, we cannot say that a reasonable trier of fact could not have formed a firm belief or conviction that THI, through Long, was directly negligent in hiring an unfit agent and/or authorized or ratified Espinoza's gross negligence. Accordingly, we find that the evidence was legally sufficient to support the jury's finding of gross negligence.

### 2. Factual Sufficiency

When the burden of proof is clear and convincing evidence, the distinction between legal and factual sufficiency is very fine. In such a factual sufficiency review we must consider all the evidence the fact finder could reasonably have found to be

---

[62]Ultimately, in May 2007, Espinoza surrendered his Texas nursing license per an agreed order in a proceeding before the Texas Board of Nursing Examiners premised on these same infractions.

[63]Despite the stipulated order in Colorado and subsequent agreed order in Texas with the state boards of nursing, Espinoza's testimony at trial indicated he yet believed he had done nothing wrong and should not have been disciplined in either case.

clear and convincing, and then determine whether any fact finder could reasonably have formed a firm belief or conviction of the truth of the allegations. *See In re J.F.C.,* 96 S.W.3d at 266; *In the Interest of C.H.,* 89 S.W.3d 17, 25, 27-29 (Tex. 2002). The difference in applying an elevated test under the clear and convincing standard is that "a higher quality of evidence is necessary to tip the scales." *Garza,* 164 S.W.3d at 625.

We consider whether the disputed evidence is such that a reasonable fact finder could have resolved it in favor of its finding. *See In re J.F.C.,* 96 S.W.3d at 266. If, in light of the entire record, disputed evidence that a reasonable fact finder could not have resolved in favor of the finding is so significant as to prevent a fact finder reasonably from forming a firm belief or conviction of the truth of the finding, then the evidence is factually insufficient. *See id.*; *In re S.M.L.D.,* 150 S.W.3d 754, 757 (Tex.App.--Amarillo 2004, no pet.).

In a single paragraph, without any citation to specific evidence in the record or its brief, THI asserts in a conclusory fashion that the evidence is factually insufficient to support the jury's findings either that: (1) Espinoza understood the extreme risks involved in administering a medication to a patient without prior approval by a physician but did not care when he prescribed Ativan for Jacob; (2) THI ratified Espinoza's conduct; (3) Espinoza was an unfit employee; or (4) THI was reckless for hiring Espinoza.

Rather than find THI waived these issues,[64] in the interest of justice, having reviewed the evidence cited by THI in support of its legal insufficiency argument on the

---

[64]Generally, because THI failed to specifically cite any record evidence in support of these general contentions, these arguments were insufficiently briefed, and therefore, waived. Tex. R. App. P. 38.1(h).

issue of gross negligence,[65] we conclude the jury could reasonably have formed a firm belief or conviction that THI was grossly negligent in hiring an unfit agent. Accordingly, we need not reach the other bases of gross negligence raised by Appellees. *See Hogue*, 271 S.W.3d at 253. THI's issues four and five are overruled.

## VI. Evidentiary Ruling - THI's Internal Investigation

During discovery, THI asserted various statutory privileges to avoid disclosing any information or documents regarding any in-house investigation undertaken by Southwest Hospital into the circumstances surrounding Jacob's death.[66] During trial, Appellees asked a number of witnesses, without objection, whether they had been approached by Southwest Hospital regarding the circumstances of Jacob's death or were aware of any investigation into his death. The witnesses answered in the negative.[67]

---

[65]In support of its legal sufficiency argument, THI argued: (1) Espinoza testified he received an order prescribing Ativan from Nurse Graham; (2) Espinoza had no specific knowledge Jacob was sensitive or had an allergy to Ativan; (3) Nurse Jahomo had no explanation for why Jacob was not wearing an allergy bracelet on December 18; (4) Nurse Jahomo was unaware that the pharmacy did not have the allergy information on Jacob that was forwarded by Covenant when Jacob was originally transferred to Southwest Hospital; and (5) Nurse Jahomo testified she made a mistake by not reviewing Jacob's MAR and correcting the MAR to show that he, in fact, had an allergy to Ativan.

[66]By interrogatory and request for production of documents, Appellees sought information related to any in-house investigation undertaken by THI. THI asserted privilege and refused to answer the interrogatory or produce any documents. When asked by Appellees' counsel prior to trial, THI's counsel represented she would not be offering any evidence of an in-house investigation into Jacob's death by Southwest Hospital.

[67]Pharmacist Dipprey, Nurse Rosales, Nurse Graham, and Espinoza testified that no one at Southwest Hospital questioned them regarding the circumstances of Jacob's death or the order for Ativan and they were unaware of any investigation into Jacob's death. Dr. Haines testified he saw no evidence of an investigation in the records he reviewed and believed the director of nursing at Southwest Hospital should have done some investigation to assure a similar incident did not happen again. THI did not object to this testimony.

To rebut the potential, yet improper, inference that the absence of an in-house investigation was some sort of corporate ratification of Espinoza's conduct, THI sought to offer the testimony of Dr. Rice concerning the matter. When Appellees objected to Dr. Rice testifying that an in-house investigation had been undertaken by Southwest Hospital, on the basis that THI had asserted its investigative privilege as to that subject during discovery, the trial court warned THI that its line of questioning would require full and complete disclosure of the investigation and its results. After consulting with her client, THI's counsel made the following statement:

> So we no longer have an issue. I will still make my objections to the granting of [Appellees' counsel's] objection, in that she opened the door, and, further, that the response to the interrogatory and request for production was an objection and privilege citation, and, the objections were never compelled or ruled on by the Court, which would have to be an action of the Plaintiffs, and we were never asked for a privilege log with respect to that privilege that was asserted.

Because THI chose to close the door on its own inquiry rather than open the door further with respect to the in-house investigation, the trial court never excluded the testimony of Dr. Rice. Accordingly, the trial court did not abuse its discretion by excluding any evidence. THI's issue six is overruled.

## VII.  DAMAGES

By its seventh and final issue, THI contends the trial court's judgment should be modified to reflect application of the various statutory provisions, found within chapters 41[68] and 74[69] of the Texas Civil Practices and Remedies Code,[70] which limit the

---

[68]Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b) (Vernon Supp. 2009).

[69]Tex. Civ. Prac. & Rem. Code Ann. §§ 74.301(b) & 74.303 (Vernon 2005).

recovery of damages by a claimant. Specifically, THI contends that: (1) § 41.008(b) should be applied to limit Appellees' recovery of exemplary damages, (2) § 74.301(b) should be applied to limit Appellees' recovery of noneconomic damages, and (3) § 74.303 should be applied to limit Appellees' overall recovery in a wrongful death and survival action on a health care liability claim. In response, Appellees contend that: (1) THI waived application of §§ 41.008(b) and 74.301(b) by failing to plead those sections as an affirmative defense, and (2) § 74.301(b) does not apply to a wrongful death claim. In response to Appellees' waiver argument, THI further contends the trial court erred by denying its motion for leave to amend its pleadings. We will address these sub-issues in their logical rather than numeric or sequential order.

## A.      Applicability of § 74.303 - Overall Damages Limitation

While the briefs filed by both THI and Appellees seem to indicate that the trial court did apply the § 74.303 limitation of damages provision in arriving at the dollar amount of the judgment entered, without a detailed explanation of the trial court's calculations, the mathematic and legal damage limiting principles applied by the trial court in the entry of its judgment are lost on this Court. Because this Court ultimately remands this case to the trial court for the entry of a judgment in accordance with this opinion, we deem it judicially appropriate to address the application of § 74.303 to the judgment to be entered in this cause.

---

[70]For convenience, throughout the remainder of this opinion, references to simply "section __" and/or "§ __" are references to the Texas Civil Practice and Remedies Code.

Section 74.303 provides that:

(a)      In a wrongful death or survival action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability for all damages, including exemplary damages, shall be limited to an amount not to exceed $500,000.00 for each claimant, regardless of the number of defendant physicians or health care providers against whom the claim is asserted or the number of separate causes of action on which the claim is based.

(b)      When there is an increase or decrease in the consumer price index with respect to the amount of that index on August 29, 1977, the liability limit described in Subsection (a) shall be increased or decreased, as applicable, by a sum equal to the amount of such limit multiplied by the percentage increase or decrease in the consumer price index, as published by the Bureau of Labor Statistics of the United States Department of Labor, that measures the average changes in prices of goods and services purchased by urban wage earners and clerical workers' families and single workers living alone (CPI-W: Seasonally adjusted U.S. City Average-All items), between August 29, 1977, and the time at which damages subject to such limits are awarded by final judgment or settlement.

(c)      Subsection (a) does not apply to the amount of damages awarded on a health care liability claim for the expenses of necessary medical, hospital, and custodial care received before judgment or required in the future for treatment of the injury.

THI contends Appellees should be considered a single claimant for purposes of their health care liability claim.  *See* Tex. Civ. Prac. & Rem. Code § 74.001(a)(2).  We find no case law that interprets the applicability of § 74.001(a)(2) in the context of the limitation of damages in a wrongful death and survival action on a health care liability claim where multiple persons are claiming to have sustained damages as the result of the bodily injury or death of a single person.  Section 74.001(a)(2) provides that:

"Claimant" means a person, including a decedent's estate, seeking or who has sought recovery of damages in a health care liability claim.  All

58

persons claiming to have sustained damages as the result of the bodily injury or death of a single person are considered a single claimant.

A plain reading of this statute clearly supports THI's contention. Therefore, for purposes of § 74.303, the estate of Jacob Perea, and his four sons, Mario, Max, Tony, and George, i.e., Appellees herein, are a single claimant, entitled to recover for all damages, including exemplary damages, but not including expenses of necessary medical, hospital, and custodial care, an amount not to exceed $500,000, as adjusted in accordance with the provisions of § 74.303(b). Based on the applicable consumer price index (CPI), on June 9, 2008, the § 74.303 cap was $1,737,272.00.[71] Because the judgment entered by the trial court did not exceed that cap, the trial court did not err in the application of the § 74.303 damage cap.

### B. Applicability of § 74.301(b) - Noneconomic Damages Limitation

THI contends the trial court erred in failing to properly apply the statutory limitation of noneconomic damages found in § 74.301(b). Section 74.301(b) provides:

> In an action on a health care liability claim where final judgment is rendered against a single health care institution, the limit of civil liability for noneconomic damages inclusive of all persons and entities for which vicarious liability theories may apply, shall be limited to an amount not to exceed $250,000 for each claimant.

Appellees contend the rules of statutory construction dictate that § 74.301(b) does not apply in this case based upon the general principle that specific statutory

---

[71]According to the U.S. Department of Labor, Bureau of Labor Statistics, Table 5. Consumer Price Index for Urban Wage Earners and Clerical Workers (CPI-W): Seasonally Adjusted U.S. City Average-All Items, the CPI for June 2008 was 213.337. *See* http://www.stats.bls.gov/PDQ/servlet/SurveyOutputServlet (last visited May 12, 2010). This represents a 247.4544% increase over the CPI for August 1977 (CPI = 61.40). Therefore, on June 9, 2008, the § 74.303 cap was $1,737,272.00 (($500,000 x 2.474544) + $500,000).

provisions should govern over general provisions. Specifically, Appellees contend that the more specific provisions of § 74.303 (which is specifically applicable to a wrongful death or survival action) apply to the exclusion of more general provisions of § 74.301(b) (which is generally applicable to health care liability claims). *See Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 901 (Tex. 2000) (determining that the judgment cap provisions of section 11.02 of article 4590i prevail over the general prejudgment interest provisions of article 5069-1.05);[72] *cf.* Tex. Gov't Code § 311.026 (Vernon 2005) (providing that, when construing code provisions that are irreconcilable, "the special or local provision prevails as an exception to the general provision").

When we construe a statute, our primary goal is to ascertain and give effect to the Legislature's intent in enacting it. Tex. Gov't Code Ann. § 312.005 (Vernon 2005); *In re Canales*, 52 S.W.3d 698 (Tex. 2001). An appellate court must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous, *City of Marshall v. City of Uncertain,* 206 S.W.3d 97, 105 (Tex. 2006) (citing *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 29 (Tex.2003)), and where general and special provisions are both applicable, those "provisions shall be construed, if possible, so that effect is given to both." Tex. Gov't Code Ann. § 311.026(a) (Vernon 2005).

Because a health care liability claim includes a cause of action against a health care provider (including a health care institution) for conduct which proximately results

---

[72]Former article 4590i, § 11.02(a) provided that "[i]n an action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability for damages of the physician or health care provider shall be limited to an amount not to exceed $500,000."

in the death of a claimant, arguably both statutory provisions can be applicable to the facts of this case. The question is, is it possible to give effect to both provisions?

We find no cases which directly decide this issue. However, because the two statutory provisions do not conflict on their face, in order to give full effect to the intent of the Legislature, we see no reason why one cap should apply to the exclusion of the other cap. Neither the express wording of the applicable statutes, nor their legislative history indicates that the Legislature intended anything other than to apply both caps. Therefore, we conclude that both caps can be applied, and should be applied. Because Appellees constitute a single claimant, unless otherwise inappropriate, the trial court should have limited THI's civil liability for noneconomic damages to $250,000.

Appellees also contend that THI waived the protections of § 74.301(b) by failing to affirmatively plead their application to the facts of this case. THI has responded to this argument by contending that: (1) statutory damage caps are not affirmative defenses, and/or (2) the trial court erred by not granting its motion to amend its pleadings. Although the Texas Supreme Court has not directly decided whether a statutory damage caps is an affirmative defense, it has recently held that the statutory damage caps contained in § 41.008(b) "requires a reduction of punitive damages as a matter of law." *In re Columbia Medical Center of Las Colinas,* 306 S.W.3d 246, 248 (Tex. 2010). *But see Wackenhut Corr. Corp. v. De La Rosa,* 305 S.W.3d 594 (Tex.App.--Corpus Christi 2009, no pet.) (holding that the cap is an affirmative defense which must be specifically pleaded by the defendant for it to apply). Although in *In re Columbia Medical Center* the Supreme Court equivocates somewhat by adding the phrase "when the parties raise the issue," 306 S.W.3d at 248, we find that the parties

here have sufficiently raised the issue before both the trial court and this Court. Therefore, we find that § 74.301(b) requires reduction of noneconomic damages as a matter of law and, as such, it is not an affirmative defense. Accordingly, we find the trial court erred in not applying the provisions of § 74.301(b) to limit THI's civil liability for noneconomic damages to $250,000.

### C. Applicability of § 41.008(b) - Exemplary Damages Limitation

THI also contends the trial court erred by failing to apply the § 41.008(b) limitation provisions to the jury's exemplary damages award. Again, Appellees counter by contending the limitation is an affirmative defense which THI waived by failing to plead and THI has responded by contending that: (1) statutory damage caps are not affirmative defenses, and/or (2) the trial court erred by not granting its motion to amend its pleadings.

Section 41.008(b) provides:

Exemplary damages awarded against a defendant may not exceed an amount equal to the *greater* of:

(1)(A) two times the amount of economic damages; plus

   (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or

(2)    $200,000.

Based upon the same analysis we applied to § 74.301(b), we find the exemplary damages cap provided by § 41.008(b) is not an affirmative defense, but must instead be applied as a matter of law. The question then becomes, do the specific provisions of § 74.303 control over the general provisions of § 41.008(b), or should a trial court seek to apply both limitations?

Again, we find no case law answering this question, and again we observe that, on their face, the two provisions do not seem to conflict. One caps exemplary damages in all suits, while the other caps all damages in wrongful death and survival actions. Because the two statutes are not irreconcilable, the statutes can be harmonized by applying the exemplary damages cap first, and then applying the overall cap second. Therefore, once again, in order to give full effect to the intent of the Legislature, we believe both provisions should be applied.

Having determined that § 41.008(b) does apply, because the limit of exemplary damages is, in part, determined by the amount of noneconomic damages, a court must further determine whether to apply the noneconomic damages limitations of § 74.301(b) to the determination of the exemplary damages cap provided by § 41.008(b). Again, we have found no cases directly determining this issue and, once again, we find that, on their face, the two statutory provisions do not conflict. Accordingly, as before, we believe both provisions should be given effect.

Because we have found that § 41.008(b) should have been applied, we find that the trial court erred in not applying that limiting provision. Furthermore, in the application of that cap, we find the trial court should apply the noneconomic damages limitation provisions of § 74.301(b) in determining the cap under § 41.008(b). Accordingly, Appellees' recovery of exemplary damages should have been limited to $285,053.94.[73]

---

[73]Appellees' economic damages equaled $17,526.97 ($12,490.25 + $5,036.72 = $17,526.97). *See* fn. 32, *supra.* Two times economic damages, plus noneconomic damages, as limited by § 74.301(b), up to $750,000, equals $285,053.94. ((2 x $17,526.97) + $250,000 = $285,053.94).

## D.    Correction of Judgment

Here, the jury awarded Jacob's estate economic damages of $17,526.97 and noneconomic damages of $40,000.00. The jury also awarded Mario, Max, Tony, and George noneconomic damages of $100,000.00 each, for a combined total of $400,000.00.   The jury further awarded Appellees exemplary damages of $1,250,000.00. Furthermore, in addition to actual damages, Appellees were entitled to recover pre-judgment interest on their actual damages. *See* Tex. Fin. Code Ann. § 304.102 (Vernon 2006).[74]   Prejudgment interest is an element of recoverable actual damages. *See Embrey v. Royal Indemn. Co.,* 986 S.W.2d 729, 732 (Tex.App.--Dallas 1999), *affd,* 22 S.W.3d 414 (Tex. 2000).   Because prejudgment interest is a part of Appellees' damages, it is subject to the overall damage limit imposed by § 74.303. *Columbia Hosp. Corp. v. Moore,* 92 S.W.3d 470, 475 (Tex. 2002) (interpreting subchapter K of former article 4590i); *Horizons/CMS Healthcare Corp.,* 34 S.W.3d at 892.

The trial court entered judgment in favor of Appellees and against THI in the sum of $1,696,895.50, plus costs of court. To the extent the trial court failed to properly apply the overall damages cap under § 74.303, the noneconomic damages cap under § 74.301(b), and/or the exemplary damages cap under § 41.008(b), the trial court erred. THI's seventh issue is sustained.

Because the jury apportioned the negligence causing the "injury in question" 90% to THI and 10% to Pharmasource Healthcare, and because Pharmasource

---

[74]Prejudgment interest may not be assessed or recovered on an award of exemplary damages.  *See* Tex. Civ. P. & Rem. Code § 41.007 (Vernon 2008).

Healthcare entered a "settlement agreement" for the sum of $63,343.44, plus costs of court, and because Pharmasource Healthcare has not appealed the judgment of the trial court, and because we do not know which election THI would make under § 33.012(c) of the Texas Civil Practices and Remedies Code, we are unable to determine the judgment that should be entered in this cause. Accordingly, we remand this cause to the trial court for the rendition of a judgment applying all applicable damages caps, the determination of applicable credits, and the apportionment of the recovery among Appellees. Tex. R. App. P. 43.3.

## CONCLUSION

The trial court's judgment is reversed and the cause is remanded to the trial court for entry of a judgment in accordance with this opinion.



Patrick A. Pirtle
Justice

Campbell, J., concurring and dissenting.